# MICHIGAN *v.* LONG

No. 82–256.   Argued February 23, 1983—Decided July 6, 1983

*Louis J. Caruso,* Solicitor General of Michigan, argued the cause for petitioner. With him on the brief were *Frank J. Kelley,* Attorney General, and *Leonard J. Malinowski,* Assistant Attorney General.

*David A. Strauss* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Assistant Attorney General Jensen,* and *Deputy Solicitor General Frey.*

*James H. Geary* argued the cause for respondent. With him on the brief was *Joseph J. Jerkins.*\*

JUSTICE O'CONNOR delivered the opinion of the Court.

In *Terry* v. *Ohio,* 392 U. S. 1 (1968), we upheld the validity of a protective search for weapons in the absence of probable cause to arrest because it is unreasonable to deny a police officer the right "to neutralize the threat of physical harm," *id.,* at 24, when he possesses an articulable suspicion that an individual is armed and dangerous. We did not, however, expressly address whether such a protective search for weapons could extend to an area beyond the person in the absence of probable cause to arrest. In the present case, respondent David Long was convicted for possession of marihuana found by police in the passenger compartment and trunk of the

---

\**David Crump, Wayne W. Schmidt,* and *James P. Manak* filed a brief for the Gulf & Great Plains Legal Foundation of America et al. as *amici curiae* urging reversal.

automobile that he was driving. The police searched the passenger compartment because they had reason to believe that the vehicle contained weapons potentially dangerous to the officers. We hold that the protective search of the passenger compartment was reasonable under the principles articulated in *Terry* and other decisions of this Court. We also examine Long's argument that the decision below rests upon an adequate and independent state ground, and we decide in favor of our jurisdiction.

## I

Deputies Howell and Lewis were on patrol in a rural area one evening when, shortly after midnight, they observed a car traveling erratically and at excessive speed.[1] The officers observed the car turning down a side road, where it swerved off into a shallow ditch. The officers stopped to investigate. Long, the only occupant of the automobile, met the deputies at the rear of the car, which was protruding

---

[1] It is clear, and the respondent concedes, that if the officers had arrested Long for speeding or for driving while intoxicated, they could have searched the passenger compartment under *New York* v. *Belton,* 453 U. S. 454 (1981), and the trunk under *United States* v. *Ross,* 456 U. S. 798 (1982), if they had probable cause to believe that the trunk contained contraband. See Tr. of Oral Arg. 41. However, at oral argument, the State informed us that while Long could have been arrested for a speeding violation under Michigan law, he was *not* arrested because "[a]s a matter of practice," police in Michigan do not arrest for speeding violations unless "more" is involved. See *id.,* at 6. The officers did issue Long an appearance ticket. The petitioner also confirmed that the officers could have arrested Long for driving while intoxicated but they "would have to go through a process to make a determination as to whether the party is intoxicated and then go from that point." *Ibid.*

The court below treated this case as involving a protective search, and not a search justified by probable cause to arrest for speeding, driving while intoxicated, or any other offense. Further, the petitioner does not argue *that* if probable cause to arrest exists, but the officers do not actually effect the arrest, the police may nevertheless conduct a search as broad as those authorized by *Belton* and *Ross.* Accordingly, we do not address that issue.

from the ditch onto the road. The door on the driver's side of the vehicle was left open.

Deputy Howell requested Long to produce his operator's license, but he did not respond. After the request was repeated, Long produced his license. Long again failed to respond when Howell requested him to produce the vehicle registration. After another repeated request, Long, who Howell thought "appeared to be under the influence of something," 413 Mich. 461, 469, 320 N. W. 2d 866, 868 (1982), turned from the officers and began walking toward the open door of the vehicle. The officers followed Long and both observed a large hunting knife on the floorboard of the driver's side of the car. The officers then stopped Long's progress and subjected him to a *Terry* protective patdown, which revealed no weapons.

Long and Deputy Lewis then stood by the rear of the vehicle while Deputy Howell shined his flashlight into the interior of the vehicle, but did not actually enter it. The purpose of Howell's action was "to search for other weapons." 413 Mich., at 469, 320 N. W. 2d, at 868. The officer noticed that something was protruding from under the armrest on the front seat. He knelt in the vehicle and lifted the armrest. He saw an open pouch on the front seat, and upon flashing his light on the pouch, determined that it contained what appeared to be marihuana. After Deputy Howell showed the pouch and its contents to Deputy Lewis, Long was arrested for possession of marihuana. A further search of the interior of the vehicle, including the glovebox, revealed neither more contraband nor the vehicle registration. The officers decided to impound the vehicle. Deputy Howell opened the trunk, which did not have a lock, and discovered inside it approximately 75 pounds of marihuana.

The Barry County Circuit Court denied Long's motion to suppress the marihuana taken from both the interior of the car and its trunk. He was subsequently convicted of possession of marihuana. The Michigan Court of Appeals affirmed Long's conviction, holding that the search of the passenger

compartment was valid as a protective search under *Terry*, *supra*, and that the search of the trunk was valid as an inventory search under *South Dakota* v. *Opperman*, 428 U. S. 364 (1976). See 94 Mich. App. 338, 288 N. W. 2d 629 (1979). The Michigan Supreme Court reversed. The court held that "the sole justification of the *Terry* search, protection of the police officers and others nearby, cannot justify the search in this case." 413 Mich., at 472, 320 N. W. 2d, at 869. The marihuana found in Long's trunk was considered by the court below to be the "fruit" of the illegal search of the interior, and was also suppressed.[2]

We granted certiorari in this case to consider the important question of the authority of a police officer to protect himself by conducting a *Terry*-type search of the passenger compartment of a motor vehicle during the lawful investigatory stop of the occupant of the vehicle. 459 U. S. 904 (1982).

## II

Before reaching the merits, we must consider Long's argument that we are without jurisdiction to decide this case because the decision below rests on an adequate and independent state ground. The court below referred twice to the State Constitution in its opinion, but otherwise relied exclusively on federal law.[3] Long argues that the Michigan

---

[2] Chief Justice Coleman dissented, arguing that *Terry* v. *Ohio*, 392 U. S. 1 (1968), authorized the area search, and that the trunk search was a valid inventory search. See 413 Mich., at 473–480, 320 N. W. 2d, at 870–873. Justice Moody concurred in the result on the ground that the trunk search was improper. He agreed with Chief Justice Coleman that the interior search was proper under *Terry*. See 413 Mich., at 480–486, 320 N. W. 2d, at 873–875.

[3] On the first occasion, the court merely cited in a footnote both the State and Federal Constitutions. See *id.*, at 471, n. 4, 320 N. W. 2d, at 869, n. 4. On the second occasion, at the conclusion of the opinion, the court stated: "We hold, therefore, that the deputies' search of the vehicle was proscribed by the Fourth Amendment to the United States Constitution and art. 1, § 11 of the Michigan Constitution." *Id.*, at 472–473, 320 N. W. 2d, at 870.

courts have provided greater protection from searches and seizures under the State Constitution than is afforded under the Fourth Amendment, and the references to the State Constitution therefore establish an adequate and independent ground for the decision below.

It is, of course, "incumbent upon this Court . . . to ascertain for itself . . . whether the asserted non-federal ground independently and adequately supports the judgment." *Abie State Bank* v. *Bryan*, 282 U. S. 765, 773 (1931). Although we have announced a number of principles in order to help us determine whether various forms of references to state law constitute adequate and independent state grounds,[4] we openly admit that we have thus far not developed a satisfying and consistent approach for resolving this vexing issue. In some instances, we have taken the strict view that if the ground of decision was at all unclear, we would dismiss the case. See, *e. g., Lynch* v. *New York ex rel. Pierson*, 293 U. S. 52 (1934). In other instances, we have vacated,

---

[4] For example, we have long recognized that "where the judgment of a state court rests upon two grounds, one of which is federal and the other non-federal in character, our jurisdiction fails if the non-federal ground is independent of the federal ground and adequate to support the judgment." *Fox Film Corp.* v. *Muller*, 296 U. S. 207, 210 (1935). We may review a state case decided on a federal ground even if it is clear that there was an available state ground for decision on which the state court could properly have relied. *Beecher* v. *Alabama*, 389 U. S. 35, 37, n. 3 (1967). Also, if, in our view, the state court " 'felt compelled by what it understood to be federal constitutional considerations to construe . . . its own law in the manner it did,' " then we will not treat a normally adequate state ground as independent, and there will be no question about our jurisdiction. *Delaware* v. *Prouse*, 440 U. S. 648, 653 (1979) (quoting *Zacchini* v. *Scripps-Howard Broadcasting Co.*, 433 U. S. 562, 568 (1977)). See also *South Dakota* v. *Neville*, 459 U. S. 553, 556–557, n. 3 (1983). Finally, "where the non-federal ground is so interwoven with the [federal ground] as not to be an independent matter, or is not of sufficient breadth to sustain the judgment without any decision of the other, our jurisdiction is plain." *Enterprise Irrigation District* v. *Farmers Mutual Canal Co.*, 243 U. S. 157, 164 (1917).

see, *e. g.*, *Minnesota* v. *National Tea Co*, 309 U. S. 551 (1940), or continued a case, see, *e. g.*, *Herb* v. *Pitcairn*, 324 U. S. 117 (1945), in order to obtain clarification about the nature of a state court decision. See also *California* v. *Krivda*, 409 U. S. 33 (1972). In more recent cases, we have ourselves examined state law to determine whether state courts have used federal law to guide their application of state law or to provide the actual basis for the decision that was reached. See *Texas* v. *Brown*, 460 U. S. 730, 732–733, n. 1 (1983) (plurality opinion). Cf. *South Dakota* v. *Neville*, 459 U. S. 553, 569 (1983) (STEVENS, J., dissenting). In *Oregon* v. *Kennedy*, 456 U. S. 667, 670–671 (1982), we rejected an invitation to remand to the state court for clarification even when the decision rested in part on a case from the state court, because we determined that the state case itself rested upon federal grounds. We added that "[e]ven if the case admitted of more doubt as to whether federal and state grounds for decision were intermixed, the fact that the state court relied to the extent it did on federal grounds requires us to reach the merits." *Id.*, at 671.

This ad hoc method of dealing with cases that involve possible adequate and independent state grounds is antithetical to the doctrinal consistency that is required when sensitive issues of federal-state relations are involved. Moreover, none of the various methods of disposition that we have employed thus far recommends itself as the preferred method that we should apply to the exclusion of others, and we therefore determine that it is appropriate to reexamine our treatment of this jurisdictional issue in order to achieve the consistency that is necessary.

The process of examining state law is unsatisfactory because it requires us to interpret state laws with which we are generally unfamiliar, and which often, as in this case, have not been discussed at length by the parties. Vacation and continuance for clarification have also been unsatisfactory both because of the delay and decrease in efficiency of judi-

cial administration, see *Dixon* v. *Duffy,* 344 U. S. 143 (1952),[5] and, more important, because these methods of disposition place significant burdens on state courts to demonstrate the presence or absence of our jurisdiction. See *Philadelphia Newspapers, Inc.* v. *Jerome,* 434 U. S. 241, 244 (1978) (REHNQUIST, J., dissenting); *Department of Motor Vehicles* v. *Rios,* 410 U. S. 425, 427 (1973) (Douglas, J., dissenting). Finally, outright dismissal of cases is clearly not a panacea because it cannot be doubted that there is an important need for uniformity in federal law, and that this need goes unsatisfied when we fail to review an opinion that rests primarily upon federal grounds and where the *independence* of an alleged state ground is not apparent from the four corners of the opinion. We have long recognized that dismissal is inappropriate "where there is strong indication . . . that the federal constitution as judicially construed controlled the decision below." *National Tea Co., supra,* at 556.

Respect for the independence of state courts, as well as avoidance of rendering advisory opinions, have been the cornerstones of this Court's refusal to decide cases where there is an adequate and independent state ground. It is precisely because of this respect for state courts, and this desire to avoid advisory opinions, that we do not wish to continue to decide issues of state law that go beyond the opinion that we review, or to require state courts to reconsider cases to clarify the grounds of their decisions. Accordingly, when, as in this case, a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible

---

[5] Indeed, *Dixon* v. *Duffy* is also illustrative of another difficulty involved in our requiring state courts to reconsider their decisions for purposes of clarification. In *Dixon,* we continued the case on two occasions in order to obtain clarification, but none was forthcoming: "[T]he California court advised petitioner's counsel informally that it doubted its jurisdiction to render such a determination." 344 U. S., at 145. We then vacated the judgment of the state court, and remanded.

state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so. If a state court chooses merely to rely on federal precedents as it would on the precedents of all other jurisdictions, then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the result that the court has reached. In this way, both justice and judicial administration will be greatly improved. If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, we, of course, will not undertake to review the decision.

This approach obviates in most instances the need to examine state law in order to decide the nature of the state court decision, and will at the same time avoid the danger of our rendering advisory opinions.[6] It also avoids the unsatisfactory and intrusive practice of requiring state courts to clarify their decisions to the satisfaction of this Court. We believe that such an approach will provide state judges with a clearer opportunity to develop state jurisprudence unimpeded by federal interference, and yet will preserve the integrity of federal law. "It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions. But it is equally important that ambiguous or obscure adjudications by state courts do not stand as barriers to a determination by this Court of the validity under the federal constitution of state action." *National Tea Co., supra,* at 557.

The principle that we will not review judgments of state courts that rest on adequate and independent state grounds

---

[6] There may be certain circumstances in which clarification is necessary or desirable, and we will not be foreclosed from taking the appropriate action.

is based, in part, on "the limitations of our own jurisdiction." *Herb* v. *Pitcairn,* 324 U. S. 117, 125 (1945).[7] The jurisdictional concern is that we not "render an advisory opinion, and if the same judgment would be rendered by the state court after we corrected its views of federal laws, our review could amount to nothing more than an advisory opinion." *Id.,* at 126. Our requirement of a "plain statement" that a decision rests upon adequate and independent state grounds does not in any way authorize the rendering of advisory opinions. Rather, in determining, as we must, whether we have jurisdiction to review a case that is alleged to rest on adequate and independent state grounds, see *Abie State Bank* v. *Bryan,* 282 U. S., at 773, we merely assume that there are no such grounds when it is not clear from the opinion itself that the state court relied upon an adequate and independent state ground and when it fairly appears that the state court rested its decision primarily on federal law.[8]

---

[7] In *Herb* v. *Pitcairn,* 324 U. S., at 128, the Court also wrote that it was desirable that state courts "be asked rather than told what they have intended." It is clear that we have already departed from that view in those cases in which we have examined state law to determine whether a particular result was guided or compelled by federal law. Our decision today departs further from *Herb* insofar as we disfavor further requests to state courts for clarification, and we require a clear and express statement that a decision rests on adequate and independent state grounds. However, the "plain statement" rule protects the integrity of state courts for the reasons discussed above. The preference for clarification expressed in *Herb* has failed to be a completely satisfactory means of protecting the state and federal interests that are involved.

[8] It is not unusual for us to employ certain presumptions in deciding jurisdictional issues. For instance, although the petitioner bears the burden of establishing our jurisdiction, *Durley* v. *Mayo,* 351 U. S. 277, 285 (1956), we have held that the party who alleges that a controversy before us has become moot has the "heavy burden" of establishing that we lack jurisdiction. *County of Los Angeles* v. *Davis,* 440 U. S. 625, 631 (1979). That is, we presume in those circumstances that we have jurisdiction until some party establishes that we do not for reasons of mootness.

We also note that the rule that we announce today was foreshadowed by our opinions in *Delaware* v. *Prouse,* 440 U. S. 648 (1979), and *Zacchini* v. *Scripps-Howard Broadcasting Co.,* 433 U. S. 562 (1977). In these cases,

Our review of the decision below under this framework leaves us unconvinced that it rests upon an independent state ground. Apart from its two citations to the State Constitution, the court below relied *exclusively* on its understanding of *Terry* and other federal cases. Not a single state case was cited to support the state court's holding that the search of the passenger compartment was unconstitutional.[9] Indeed,

the state courts relied on both state and federal law. We determined that we had jurisdiction to decide the cases because our reading of the opinions led us to conclude that each court "felt compelled by what it understood to be federal constitutional considerations to construe and apply its own law in the manner it did." *Zacchini, supra,* at 568; *Delaware, supra,* at 653. In *Delaware,* we referred to prior state decisions that confirmed our understanding of the opinion in that case, but our primary focus was on the face of the opinion. In *Zacchini,* we relied entirely on the syllabus and opinion of the state court.

In dissent, JUSTICE STEVENS proposes the novel view that this Court should never review a state court decision unless the Court wishes to vindicate a federal right that has been endangered. The rationale of the dissent is not restricted to cases where the decision is arguably supported by adequate and independent state grounds. Rather, JUSTICE STEVENS appears to believe that even if the decision below rests exclusively on federal grounds, this Court should not review the decision as long as there is no federal right that is endangered.

The state courts handle the vast bulk of all criminal litigation in this country. In 1982, more than 12 million criminal actions (excluding juvenile and traffic charges) were filed in the 50 state court systems and the District of Columbia. See 7 State Court Journal, No. 1, p. 18 (1983). By comparison, approximately 32,700 criminal suits were filed in federal courts during that same year. See Annual Report of the Director of the Administrative Office of the United States Courts 6 (1982). The state courts are required to apply federal constitutional standards, and they necessarily create a considerable body of "federal law" in the process. It is not surprising that this Court has become more interested in the application and development of federal law by state courts in the light of the recent significant expansion of federally created standards that we have imposed on the States.

[9] At oral argument, Long argued that the state court relied on its decision in *People* v. *Reed,* 393 Mich. 342, 224 N. W. 2d 867, cert. denied, 422 U. S. 1044 (1975). See Tr. of Oral Arg. 29. However, the court cited that case only in the context of a statement that the State did not seek to justify the search in this case "by reference to other exceptions to the war-

the court declared that the search in this case was unconstitutional because "[t]he Court of Appeals erroneously applied the principles of *Terry* v. *Ohio* . . . to the search of the interior of the vehicle in this case." 413 Mich., at 471, 320 N. W. 2d, at 869. The references to the State Constitution in no way indicate that the decision below rested on grounds in any way *independent* from the state court's interpretation of federal law. Even if we accept that the Michigan Constitution has been interpreted to provide independent protection for certain rights also secured under the Fourth Amendment, it fairly appears in this case that the Michigan Supreme Court rested its decision primarily on federal law.

Rather than dismissing the case, or requiring that the state court reconsider its decision on our behalf solely because of a mere possibility that an adequate and independent ground supports the judgment, we find that we have jurisdiction in the absence of a plain statement that the decision below rested on an adequate and independent state ground. It appears to us that the state court "felt compelled by what it understood to be federal constitutional considerations to construe . . . its own law in the manner it did." *Zacchini* v. *Scripps-Howard Broadcasting Co.*, 433 U. S. 562, 568 (1977).[10]

---

rant requirement." 413 Mich., at 472, 320 N. W. 2d, at 869–870 (footnote omitted). The court then noted that *Reed* held that "'[a] warrantless search and seizure is unreasonable per se and violates the Fourth Amendment of the United States Constitution and Art. 1, § 11 of the state constitution unless shown to be within one of the exceptions to the rule.'" 413 Mich., at 472–473, n. 8, 320 N. W. 2d, at 870, n. 8.

[10] There is nothing unfair about requiring a plain statement of an independent state ground in this case. Even if we were to rest our decision on an evaluation of the state law relevant to Long's claim, as we have sometimes done in the past, our understanding of Michigan law would also result in our finding that we have jurisdiction to decide this case. Under state search-and-seizure law, a "higher standard" is imposed under Art. 1, § 11, of the 1963 Michigan Constitution. See *People* v. *Secrest,* 413 Mich. 521, 525, 321 N. W. 2d 368, 369 (1982). If, however, the item seized is, *inter*

## III

The court below held, and respondent Long contends, that Deputy Howell's entry into the vehicle cannot be justified under the principles set forth in *Terry* because *"Terry* authorized only a limited pat-down search of a *person* suspected of criminal activity" rather than a search of an area. 413

*alia*, a "narcotic drug . . . seized by a peace officer outside the curtilage of any dwelling house in this state," Art. 1, § 11, of the 1963 Michigan Constitution, then the seizure is governed by a standard identical to that imposed by the Fourth Amendment. See *People* v. *Moore,* 391 Mich. 426, 435, 216 N. W. 2d 770, 775 (1974).

Long argues that under the current Michigan Comp. Laws § 333.7107 (1979), the definition of a "narcotic" does not include marihuana. The difficulty with this argument is that Long fails to cite any authority for the proposition that the term "narcotic" as used in the Michigan Constitution is dependent on current statutory definitions of that term. Indeed, it appears that just the opposite is true. The Michigan Supreme Court has held that constitutional provisions are presumed "to be interpreted in accordance with existing laws and legal usages of the time" of the passage of the provision. *Bacon* v. *Kent-Ottawa Authority,* 354 Mich. 159, 169, 92 N. W. 2d 492, 497 (1958). If the state legislature were able to change the interpretation of a constitutional provision by statute, then the legislature would have "the power of outright repeal of a duly-voted constitutional provision." *Ibid.* Applying these principles, the Michigan courts have held that a statute passed subsequent to the applicable state constitutional provision is not relevant for interpreting its Constitution, and that a definition in a legislative Act pertains only to that Act. *Jones* v. *City of Ypsilanti,* 26 Mich. App. 574, 182 N. W. 2d 795 (1970). See also *Walber* v. *Piggins,* 2 Mich. App. 145, 138 N. W. 2d 772 (1966), aff'd, 381 Mich. 138, 160 N. W. 2d 876 (1968). At the time that the 1963 Michigan Constitution was enacted, it is clear that marihuana was considered a narcotic drug. See 1961 Mich. Pub. Acts, No. 206, § 1(f). Indeed, it appears that marihuana was considered a narcotic drug in Michigan until 1978, when it was removed from the narcotic classification. We would conclude that the seizure of marihuana in Michigan is not subject to analysis under any "higher standard" than may be imposed on the seizure of other items. In the light of our holding in *Delaware* v. *Prouse,* 440 U. S. 648 (1979), that an interpretation of state law in our view compelled by federal constitutional considerations is not an independent state ground, we would have jurisdiction to decide the case.

Mich., at 472, 320 N. W. 2d, at 869 (footnote omitted). Brief for Respondent 10. Although *Terry* did involve the protective frisk of a person, we believe that the police action in this case is justified by the principles that we have already established in *Terry* and other cases.

In *Terry*, the Court examined the validity of a "stop and frisk" in the absence of probable cause and a warrant. The police officer in *Terry* detained several suspects to ascertain their identities after the officer had observed the suspects for a brief period of time and formed the conclusion that they were about to engage in criminal activity. Because the officer feared that the suspects were armed, he patted down the outside of the suspects' clothing and discovered two revolvers.

Examining the reasonableness of the officer's conduct in *Terry*,[11] we held that there is "'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.'" 392 U. S., at 21 (quoting *Camara* v. *Municipal Court*, 387 U. S. 523, 536–537 (1967)). Although the conduct of the officer in *Terry* involved a "severe, though brief, intrusion upon cherished personal security," 392 U. S., at 24–25,

---

[11] Although we did not in any way weaken the warrant requirement, we acknowledged that the typical "stop and frisk" situation involves "an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Terry*, 392 U. S., at 20 (footnote omitted). We have emphasized that the propriety of a *Terry* stop and frisk is to be judged according to whether the officer acted as a "reasonably prudent man" in deciding that the intrusion was justified. *Id.*, at 27. "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams* v. *Williams*, 407 U. S. 143, 146 (1972).

we found that the conduct was reasonable when we weighed the interest of the individual against the legitimate interest in "crime prevention and detection," *id.*, at 22, and the "need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." *Id.*, at 24. When the officer has a reasonable belief "that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Ibid.*

Although *Terry* itself involved the stop and subsequent patdown search of a person, we were careful to note that "[w]e need not develop at length in this case, however, the limitations which the Fourth Amendment places upon a protective search and seizure for weapons. These limitations will have to be developed in the concrete factual circumstances of individual cases." *Id.*, at 29. Contrary to Long's view, *Terry* need not be read as restricting the preventative search to the person of the detained suspect.[12]

In two cases in which we applied *Terry* to specific factual situations, we recognized that investigative detentions involving suspects in vehicles are especially fraught with danger to police officers. In *Pennsylvania* v. *Mimms*, 434 U. S. 106 (1977), we held that police may order persons out of

---

[12] As Chief Justice Coleman noted in her dissenting opinion in the present case:

"The opinion in *Terry* authorized the frisking of an overcoat worn by defendant because that was the issue presented by the facts. One could reasonably conclude that a different result would not have been constitutionally required if the overcoat had been carried, folded over the forearm, rather than worn. The constitutional principles stated in *Terry* would still control." 413 Mich., at 475–476, 320 N. W. 2d, at 871 (footnote omitted).

an automobile during a stop for a traffic violation, and may frisk those persons for weapons if there is a reasonable belief that they are armed and dangerous. Our decision rested in part on the "inordinate risk confronting an officer as he approaches a person seated in an automobile." *Id.*, at 110. In *Adams* v. *Williams*, 407 U. S. 143 (1972), we held that the police, acting on an informant's tip, may reach into the passenger compartment of an automobile to remove a gun from a driver's waistband even where the gun was not apparent to police from outside the car and the police knew of its existence only because of the tip. Again, our decision rested in part on our view of the danger presented to police officers in "traffic stop" and automobile situations.[13]

Finally, we have also expressly recognized that suspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed. In the Term following *Terry*, we decided *Chimel* v. *California*, 395 U. S. 752 (1969), which involved the limitations imposed on police authority to conduct a search incident to a valid arrest. Relying explicitly on *Terry*, we held that when an arrest is made, it is reasonable for the arresting officer to search "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." 395 U. S., at 763. We reasoned that "[a] gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested." *Ibid.* In *New York* v. *Belton*, 453 U. S. 454 (1981), we determined that the lower courts "have found no workable definition of 'the area within the immediate control of the arrestee' when

---

[13] According to one study, "approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, Police Officer Shootings—A Tactical Evaluation, 54 J. Crim. L. C. & P. S. 93 (1963)." *Adams* v. *Williams*, *supra*, at 148, n. 3.

that area arguably includes the interior of an automobile and the arrestee is its recent occupant." *Id.*, at 460. In order to provide a "workable rule," *ibid.*, we held that "articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within 'the area into which an arrestee might reach in order to grab a weapon' . . . ." *Ibid.* (quoting *Chimel, supra*, at 763). We also held that the police may examine the contents of any open or closed container found within the passenger compartment, "for if the passenger compartment is within the reach of the arrestee, so will containers in it be within his reach." 453 U. S., at 460 (footnote omitted). See also *Michigan* v. *Summers*, 452 U. S. 692, 702 (1981).

Our past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.[14] See *Terry*, 392

---

[14] We stress that our decision does not mean that the police may conduct automobile searches *whenever* they conduct an investigative stop, although the "bright line" that we drew in *Belton* clearly authorizes such a search whenever officers effect a custodial arrest. An additional interest exists in the arrest context, *i. e.*, preservation of evidence, and this justifies an "automatic" search. However, that additional interest does not exist in the *Terry* context. A *Terry* search, "unlike a search without a warrant incident to a lawful arrest, is not justified by any need to prevent the disappearance or destruction of evidence of crime. . . . The sole justification of

U. S., at 21. "[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.*, at 27. If a suspect is "dangerous," he is no less dangerous simply because he is not arrested. If, while conducting a legitimate *Terry* search of the interior of the automobile, the officer should, as here, discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances. *Coolidge* v. *New Hampshire*, 403 U. S. 443, 465 (1971); *Michigan* v. *Tyler*, 436 U. S. 499, 509 (1978); *Texas* v. *Brown*, 460 U. S., at 739 (plurality opinion by REHNQUIST, J.); *id.*, at 746 (POWELL, J., concurring in judgment).

The circumstances of this case clearly justified Deputies Howell and Lewis in their reasonable belief that Long posed a danger if he were permitted to reenter his vehicle. The hour was late and the area rural. Long was driving his automobile at excessive speed, and his car swerved into a ditch. The officers had to repeat their questions to Long, who appeared to be "under the influence" of some intoxicant. Long was not frisked until the officers observed that there was a large knife in the interior of the car into which Long was about to reenter. The subsequent search of the car was restricted to those areas to which Long would generally have immediate control, and that could contain a weapon. The trial court determined that the leather pouch containing

---

the search . . . is the protection of the police officer and others nearby . . . ." 392 U. S., at 29. What we borrow now from *Chimel* v. *California*, 395 U. S. 752 (1969), and *Belton* is merely the recognition that part of the reason to allow area searches incident to an arrest is that the arrestee, who may not himself be armed, may be able to gain access to weapons to injure officers or others nearby, or otherwise to hinder legitimate police activity. This recognition applies as well in the *Terry* context. However, because the interest in collecting and preserving evidence is not present in the *Terry* context, we require that officers who conduct area searches during investigative detentions must do so only when they have the level of suspicion identified in *Terry*.

marihuana could have contained a weapon. App. 64a.[15]   It is clear that the intrusion was "strictly circumscribed by the exigencies which justifi[ed] its initiation." *Terry, supra,* at 26.

In evaulating the validity of an officer's investigative or protective conduct under *Terry,* the "[t]ouchstone of our analysis . . . is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania* v. *Mimms,* 434 U. S., at 108–109 (quoting *Terry, supra,* at 19).   In this case, the officers did not act unreasonably in taking preventive measures to ensure that there were no other weapons within Long's immediate grasp before permitting him to reenter his automobile.   Therefore, the balancing required by *Terry* clearly weighs in favor of allowing the police to conduct an area search of the passenger compartment to uncover weapons, as long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous.

The Michigan Supreme Court appeared to believe that it was not reasonable for the officers to fear that Long could injure them, because he was effectively under their control during the investigative stop and could not get access to any weapons that might have been located in the automobile. See 413 Mich., at 472, 320 N. W. 2d, at 869.   This reasoning is mistaken in several respects.   During any investigative detention, the suspect is "in the control" of the officers in the sense that he "may be briefly detained against his will . . . ." *Terry, supra,* at 34 (WHITE, J., concurring).   Just as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in Long's position break away from police control and retrieve a weapon from his automobile.   See *United States* v. *Rainone,* 586 F. 2d 1132, 1134 (CA7 1978), cert. denied, 440 U. S. 980 (1979).   In addi-

---

[15] Of course, our analysis would apply to justify the search of Long's person that was conducted by the officers after the discovery of the knife.

tion, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside. *United States* v. *Powless,* 546 F. 2d 792, 795–796 (CA8), cert. denied, 430 U. S. 910 (1977). Or, as here, the suspect may be permitted to reenter the vehicle before the *Terry* investigation is over, and again, may have access to weapons. In any event, we stress that a *Terry* investigation, such as the one that occurred here, involves a police investigation "at close range," *Terry,* 392 U. S., at 24, when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a "quick decision as to how to protect himself and others from possible danger . . . ." *Id.,* at 28. In such circumstances, we have not required that officers adopt alternative means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter.[16]

---

[16] Long makes a number of arguments concerning the invalidity of the search of the passenger compartment. The thrust of these arguments is that *Terry* searches are limited in scope and that an area search is fundamentally inconsistent with this limited scope. We have recognized that *Terry* searches are limited insofar as they may not be conducted in the absence of an articulable suspicion that the intrusion is justified, see, *e. g., Sibron* v. *New York,* 392 U. S. 40, 65 (1968), and that they are protective in nature and limited to weapons, see *Ybarra* v. *Illinois,* 444 U. S. 85, 93–94 (1979). However, neither of these concerns is violated by our decision. To engage in an area search, which is limited to seeking weapons, the officer must have an articulable suspicion that the suspect is potentially dangerous.

Long also argues that there cannot be a legitimate *Terry* search based on the discovery of the hunting knife because Long possessed that weapon legally. See Brief for Respondent 17. Assuming, *arguendo,* that Long possessed the knife lawfully, we have expressly rejected the view that the validity of a *Terry* search depends on whether the weapon is possessed in accordance with state law. See *Adams* v. *Williams,* 407 U. S., at 146.

Contrary to JUSTICE BRENNAN's suggestion in dissent, the reasoning of *Terry, Chimel,* and *Belton* points clearly to the direction that we have taken today. Although *Chimel* involved a full custodial arrest, the rationale for *Chimel* rested on the recognition in *Terry* that it is unreasonable to prevent the police from taking reasonable steps to protect their safety.

## IV

The trial court and the Court of Appeals upheld the search of the trunk as a valid inventory search under this Court's decision in *South Dakota* v. *Opperman,* 428 U. S. 364 (1976). The Michigan Supreme Court did not address this holding, and instead suppressed the marihuana taken from the trunk as a fruit of the illegal search of the interior of the automobile. Our holding that the initial search was justified under *Terry* makes it necessary to determine whether the trunk search was permissible under the Fourth Amendment. However, we decline to address this question because it was not passed upon by the Michigan Supreme Court, whose decision we review in this case. See *Cardinale* v. *Louisiana,* 394 U. S. 437, 438 (1969). We remand this issue to the court below, to enable it to determine whether the trunk search was permissible under *Opperman, supra,* or other decisions of this Court. See, *e. g., United States* v. *Ross,* 456 U. S. 798 (1982).[17]

---

JUSTICE BRENNAN suggests that we are expanding the scope of a *Terry*-type search to include a search incident to a valid arrest. However, our opinion clearly indicates that the area search that we approve is limited to a search for weapons in circumstances where the officers have a reasonable belief that the suspect is potentially dangerous to them. JUSTICE BRENNAN quotes at length from *Sibron,* but fails to recognize that the search in that case was a search for narcotics, and not a search for weapons.

JUSTICE BRENNAN concedes that "police should not be exposed to unnecessary danger in the performance of their duties," *post,* at 1064, but then would require that police officers, faced with having to make quick determinations about self-protection and the defense of innocent citizens in the area, must also decide instantaneously what "less intrusive" alternative exists to ensure that any threat presented by the suspect will be neutralized. *Post,* at 1065. For the practical reasons explained in *Terry,* 392 U. S., at 24, 28, we have never required police to adopt alternative measures to avoid a legitimate *Terry*-type intrusion.

[17] Long suggests that the trunk search is invalid under state law. See Tr. of Oral Arg. 41, 43–44. The Michigan Supreme Court is, of course, free to determine the validity of that search under state law.

## V

The judgment of the Michigan Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, concurring in part and concurring in the judgment.

I join Parts I, III, IV, and V of the Court's opinion. While I am satisfied that the Court has jurisdiction in this particular case, I do not join the Court, in Part II of its opinion, in fashioning a new presumption of jurisdiction over cases coming here from state courts. Although I agree with the Court that uniformity in federal criminal law is desirable, I see little efficiency and an increased danger of advisory opinions in the Court's new approach.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

The Court today holds that "the protective search of the passenger compartment" of the automobile involved in this case "was reasonable under the principles articulated in *Terry* and other decisions of this Court." *Ante,* at 1035. I disagree. *Terry* v. *Ohio,* 392 U. S. 1 (1968), does not support the Court's conclusion and the reliance on "other decisions" is patently misplaced. Plainly, the Court is simply continuing the process of distorting *Terry* beyond recognition and forcing it into service as an unlikely weapon against the Fourth Amendment's fundamental requirement that searches and seizures be based on probable cause. See *United States* v. *Place,* 462 U. S. 696, 714–717 (1983) (BRENNAN, J., concurring in result). I, therefore, dissent.[1]

---

[1] I agree that the Court has jurisdiction to decide this case. See *ante,* at 1044–1045, n. 10.

On three occasions this Term I have discussed the limited scope of the exception to the probable-cause requirement created by *Terry* and its progeny. See *Florida* v. *Royer*, 460 U. S. 491, 509–511 (1983) (BRENNAN, J., concurring in result); *Kolender* v. *Lawson*, 461 U. S. 352, 364–365 (1983) (BRENNAN, J., concurring); *United States* v. *Place, supra*, at 711–717 (BRENNAN, J., concurring in result). I will not repeat those discussions here and note only that *"Terry*, and the cases that followed it, permit only brief investigative stops and extremely limited searches based on reasonable suspicion." 462 U. S., at 714. However, the Court's opinion compels a detailed review of *Terry* itself.

In *Terry*, the Court confronted the "quite narrow question" of "whether it is always unreasonable for a policeman to seize a person and subject him to a *limited* search for weapons unless there is probable cause for an arrest." 392 U. S., at 15 (emphasis supplied). Because the Court was dealing "with an entire rubric of police conduct . . . which historically [had] not been, and as a practical matter could not be, subjected to the warrant procedure," *id.*, at 20, the Court tested the conduct at issue "by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Ibid.* (footnote omitted). In considering the "reasonableness" of the conduct, the Court balanced "'the need to search [or seize] against the invasion which the search [or seizure] entails.'" *Id.*, at 21, quoting *Camara* v. *Municipal Court*, 387 U. S. 523, 534–535, 536–537 (1967). It deserves emphasis that in discussing the "invasion" at issue, the Court stated that "[e]ven *a limited search of the outer clothing for weapons* constitutes a severe, though brief, intrusion upon cherished personal security . . . ." 392 U. S., at 24–25 (emphasis supplied). Ultimately, the Court concluded that "there must be *a narrowly drawn authority* to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has prob-

able cause to arrest the individual for a crime." *Id.*, at 27 (emphasis supplied). The Court expressed its holding as follows:

> "We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct *a carefully limited search of the outer clothing of such persons* in an attempt to discover weapons which might be used to assault him." *Id.*, at 30 (emphasis supplied).

It is clear that *Terry* authorized only limited searches of the person for weapons. In light of what *Terry* said, relevant portions of which the Court neglects to quote, the Court's suggestion that *"Terry* need not be read as restricting the preventive search to the person of the detained suspect," *ante,* at 1047 (footnote omitted), can only be described as disingenuous. Nothing in *Terry* authorized police officers to search a suspect's car based on reasonable suspicion. The Court confirmed this this very Term in *United States* v. *Place, supra,* where it described the search authorized by *Terry* as a "limited search for weapons, or 'frisk' . . . ." 462 U. S., at 702. The search at issue in this case is a far cry from a "frisk" and certainly was not "limited." [2]

---

[2] Neither *Pennsylvania* v. *Mimms,* 434 U. S. 106 (1977), nor *Adams* v. *Williams,* 407 U. S. 143 (1972), provides any support for the Court's conclusion in this case. The *Terry* searches in *Mimms* and *Adams* were both limited and involved only searches of the person. See 434 U. S., at 111–112; 407 U. S., at 146, 148.

The Court's reliance on *Chimel* v. *California*, 395 U. S. 752 (1969), and *New York* v. *Belton*, 453 U. S. 454 (1981), as support for its new "area search" rule within the context of a *Terry* stop is misplaced. In *Chimel*, the Court addressed the scope of a search incident to a lawful arrest, 395 U. S., at 753, and held invalid the search at issue there because it "went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him." *Id.*, at 768. *Chimel* stressed the need to limit the scope of searches incident to arrest and overruled two prior decisions of this Court validating overly broad searches. *Ibid.*

In *Belton*, the Court considered the scope of a search incident to the lawful custodial arrest of an occupant of an automobile. 453 U. S., at 455. In this "particular and problematic context," *id.*, at 460, n. 3, the Court held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Id.*, at 460 (footnote omitted).[3]

The critical distinction between this case and *Terry* on the one hand, and *Chimel* and *Belton* on the other, is that the latter two cases arose within the context of lawful custodial arrests supported by probable cause.[4] The Court in *Terry* expressly recognized the difference between a search incident to arrest and the "limited search for weapons," 392 U. S., at 25, involved in that case. The Court stated:

---

[3] The Court went on to state that "the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach." 453 U. S. 460 (footnote omitted).

[4] There was no arrest before the search in this case, see *ante*, at 1035, n. 1, and the Court does not address whether the police may conduct a search as broad as those authorized by *Belton* and *United States* v. *Ross*, 456 U. S. 798 (1982), if they have probable cause to arrest, but do not actually effect the arrest. See *ante*, at 1035, n. 1.

"[A search incident to arrest], although justified in part by the acknowledged necessity to protect the arresting officer from assault with a concealed weapon, . . . is also justified on other grounds, . . . and can therefore involve a relatively extensive exploration of the person. A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation. . . . Thus it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a 'full' search, even though it remains a serious intrusion.

". . . An arrest is a wholly different kind of intrusion upon individual freedom from a limited search for weapons, and the interests each is designed to serve are likewise quite different. An arrest is the initial stage of a criminal prosecution. It is intended to vindicate society's interest in having its laws obeyed, and it is inevitably accompanied by future interference with the individual's freedom of movement, whether or not trial or conviction ultimately follows. The protective search for weapons, on the other hand, constitutes a brief, though far from inconsiderable, intrusion upon the sanctity of the person." *Id.*, at 25–26 (footnote omitted).

In *United States* v. *Robinson*, 414 U. S. 218 (1973), the Court relied on the differences between searches incident to lawful custodial arrests and *Terry* "stop-and-frisk" searches to reject an argument that the limitations established in *Terry* should be applied to a search incident to arrest. 414 U. S., at 228. The Court noted that *"Terry* clearly recognized the distinction between the two types of searches, and that a different rule governed one than governed the other," *id.*, at 233, and described *Terry* as involving "stricter . . . standards," 414 U. S., at 234, than those governing searches incident to arrest. The Court went on to state:

"A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.  It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." *Id.*, at 235.

See also *id.*, at 237–238 (POWELL, J., concurring) ("The search incident to arrest is reasonable under the Fourth Amendment because the privacy interest protected by that constitutional guarantee is legitimately abated by the fact of arrest" (footnote omitted)); *Gustafson* v. *Florida*, 414 U. S. 260, 264 (1973).

As these cases recognize, there is a vital difference between searches incident to lawful custodial arrests and *Terry* protective searches.  The Court deliberately ignores that difference in relying on principles developed within the context of intrusions supported by probable cause to arrest to construct an "area search" rule within the context of a *Terry* stop.

The Court denies that an "area search" is fundamentally inconsistent with *Terry*, see *ante*, at 1052, n. 16, stating:

"We have recognized that *Terry* searches are limited insofar as they may not be conducted in the absence of an articulable suspicion that the intrusion is justified, see *e. g.*, *Sibron* v. *New York*, 392 U. S. 40, 65 (1968), and that they are protective in nature and limited to weapons, see *Ybarra* v. *Illinois*, 444 U. S. 85, 93–94 (1979). However, neither of these concerns is violated by our decision.  To engage in an area search, which is limited to seeking weapons, the officer must have an articulable suspicion that the suspect is potentially dangerous." *Ibid.*

This patently is no answer: respondent's argument relates to the *scope* of the search, not to the standard that justifies it. The Court flouts *Terry*'s holding that *Terry* searches must be carefully limited in scope. See *supra,* at 1056. Indeed, the page in *Sibron* v. *New York,* 392 U. S. 40 (1968), cited by the Court states:

> "Even assuming *arguendo* that there were adequate grounds to search Sibron for weapons, the nature *and scope* of the search conducted by Patrolman Martin were so clearly unrelated to that justification as to render the heroin inadmissible. The search for weapons approved in *Terry* consisted *solely of a limited patting of the outer clothing of the suspect* for concealed objects which might be used as instruments of assault. Only when he discovered such objects did the officer in *Terry* place his hands in the pockets of the men he searched. In this case, with no attempt at an initial limited exploration for arms, Patrolman Martin thrust his hand into Sibron's pocket and took from him envelopes of heroin. His testimony shows that he was looking for narcotics, and he found them. The search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man." *Id.,* at 65 (emphasis supplied).[5]

As this passage makes clear, the scope of a search is determined not only by reference to its purpose, but also by reference to its intrusiveness. Yet the Court today holds that a search of a car (and the containers within it) that is not even occupied by the suspect is only as intrusive as, or perhaps less intrusive than, thrusting a hand into a pocket after an

---

[5] See also *Ybarra* v. *Illinois,* 444 U. S. 85, 93 (1979) ("Under *[Terry]* a law enforcement officer, for his own protection and safety, may conduct a *patdown* to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted" (emphasis supplied)).

initial patdown has suggested the presence of concealed objects that might be used as weapons.

The Court suggests no limit on the "area search" it now authorizes. The Court states that a "search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Ante*, at 1049 (footnote omitted). Presumably a weapon "may be placed or hidden" anywhere in a car. A weapon also might be hidden in a container in the car. In this case, the Court upholds the officer's search of a leather pouch because it "could have contained a weapon." *Ante*, at 1050–1051 (footnote omitted). In addition, the Court's requirement that an officer have a reasonable suspicion that a suspect is armed and dangerous does little to check the initiation of an area search. In this case, the officers saw a hunting knife in the car, see *ante*, at 1036, 1050, but the Court does not base its holding that the subsequent search was permissible on the ground that possession of the knife may have been illegal under state law. See *ante*, at 1052–1053, n. 16. An individual can lawfully possess many things that can be used as weapons. A hammer, or a baseball bat, can be used as a very effective weapon. Finally, the Court relies on the following facts to conclude that the officers had a reasonable suspicion that respondent was presently dangerous: the hour was late; the area was rural; respondent had been driving at an excessive speed; he had been involved in an accident; he was not immediately responsive to the officers' questions; and he appeared to be under the influence of some intoxicant. *Ante*, at 1050. Based on these facts, one might reasonably conclude that respondent was drunk. A drunken driver is indeed dangerous while driving, but not while stopped on the roadside by

the police. Even when an intoxicated person lawfully has in his car an object that could be used as a weapon, it requires imagination to conclude that he is presently dangerous. Even assuming that the facts in this case justified the officers' initial "frisk" of respondent, see *ante,* at 1035–1036, 1050–1051, and n. 15, they hardly provide adequate justification for a search of a suspect's car and the containers within it. This represents an intrusion not just different in degree, but in kind, from the intrusion sanctioned by *Terry.* In short, the implications of the Court's decision are frightening.

The Court also rejects the Michigan Supreme Court's view that it "was not reasonable for the officers to fear that [respondent] could injure them, because he was effectively under their control during the investigative stop and could not get access to any weapons that might have been located in the automobile." *Ante,* at 1051. In this regard, the Court states:

> "[W]e stress that a *Terry* investigation, such as the one that occurred here, involves a police investigation 'at close range,' . . . when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a 'quick decision as to how to protect himself and others from possible danger.' . . . In such circumstances, we have not required that officers adopt alternative means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter." *Ante,* at 1052 (footnote omitted; emphasis in original).

Putting aside the fact that the search at issue here involved a far more serious intrusion than that "involved in a *Terry* encounter," see *ibid.,* and as such might suggest the need for resort to "alternative means," the Court's reasoning is perverse. The Court's argument in essence is that the *absence* of probable cause to arrest compels the conclusion that a broad search, traditionally associated in scope with a search incident to arrest, must be permitted based on reasonable suspicion. But *United States* v. *Robinson,* stated: "It is

scarcely open to doubt that the danger to an officer is far greater in the case of the extended exposure which follows the taking of a suspect into custody and transporting him to the police station than in the case of the relatively fleeting contact resulting from the typical *Terry*-type stop." 414 U. S., at 234–235. In light of *Robinson*'s observation, today's holding leaves in grave doubt the question of whether the Court's assessment of the relative dangers posed by given confrontations is based on any principled standard.

Moreover, the Court's reliance on a "balancing" of the relevant interests to justify its decision, see *ante*, at 1051, is certainly inappropriate. In *Dunaway* v. *New York*, 442 U. S. 200 (1979), the Court stated that "[t]he narrow intrusions involved in [*Terry* and its progeny] were judged by a balancing test rather than by the general principle that Fourth Amendment seizures must be supported by the 'long-prevailing standards' of probable cause, . . . only because these intrusions fell far short of the kind of intrusion associated with an arrest." *Id.*, at 212. The intrusion involved in this case is precisely "the kind of intrusion associated with an arrest." There is no justification, therefore, for "balancing" the relevant interests.

In sum, today's decision reflects once again the threat to Fourth Amendment values posed by "balancing." See *United States* v. *Place*, 462 U. S., at 717–719 (BRENNAN, J., concurring in result). As Justice Frankfurter stated in *United States* v. *Rabinowitz*, 339 U. S. 56 (1950):

> "To say that the search must be reasonable is to require some criterion of reason. It is no guide at all either for a jury or for district judges or the police to say that an 'unreasonable search' is forbidden—that the search must be reasonable. What is the test of reason which makes a search reasonable? The test is the reason underlying and expressed by the Fourth Amendment: the history and the experience which it embodies and the safeguards afforded by it against the evils to which it was a response." *Id.*, at 83 (dissenting opinion).

Hornbook law has been that "the police may not conduct a search unless they first convince a neutral magistrate that there is probable cause to do so." *New York* v. *Belton*, 453 U. S., at 457. While under some circumstances the police may search a car without a warrant, see, *e. g.*, *Carroll* v. *United States*, 267 U. S. 132 (1925), "the exception to the warrant requirement established in *Carroll* . . . applies only to searches of vehicles that are supported by probable cause." *United States* v. *Ross*, 456 U. S. 798, 809 (1982) (footnote omitted). "[T]he Court in *Carroll* emphasized the importance of the requirement that officers have probable cause to believe that the vehicle contains contraband." *Id.*, at 807–808. See also *Almeida-Sanchez* v. *United States*, 413 U. S. 266, 269 (1973) ("Automobile or no automobile, there must be probable cause for the search" (footnote omitted)). Today the Court discards these basic principles and employs the very narrow exception established by *Terry* "to swallow the general rule that Fourth Amendment [searches of cars] are 'reasonable' only if based on probable cause."[6] *Dunaway* v. *New York, supra*, at 213. See also *United States* v. *Place, supra*, at 718–719 (BRENNAN, J., concurring in result).

Today's decision disregards the Court's warning in *Almeida-Sanchez:* "The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards." 413 U. S., at 273. Of course, police should not be exposed to unnecessary danger in the performance of their duties. But a search of a car and the containers within it based on nothing more than reasonable suspicion, even under the circumstances present

---

[6] Of course, the Court's decision also swallows the general rule that searches of containers must be based on probable cause. Without probable cause to search the car, *United States* v. *Ross* does not apply. See 456 U. S., at 825. Moreover, in the absence of a lawful custodial arrest, see n. 4, *supra*, *New York* v. *Belton* does not apply. See 453 U. S., at 460; *supra*, at 1057–1058.

here, cannot be sustained without doing violence to the requirements of the Fourth Amendment. There is no reason in this case why the officers could not have pursued less intrusive, but equally effective, means of insuring their safety.[7] Cf. *United States* v. *Place, supra,* at 715–716; *Florida* v. *Royer,* 460 U. S., at 511, n. (BRENNAN, J., concurring in result). The Court takes a long step today toward "balancing" into oblivion the protections the Fourth Amendment affords. I dissent, for as Justice Jackson said in *Brinegar* v. *United States,* 338 U. S. 160 (1949):

> "[Fourth Amendment rights] are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government." *Id.,* at 180 (dissenting opinion).

JUSTICE STEVENS, dissenting.

The jurisprudential questions presented in this case are far more important than the question whether the Michigan police officer's search of respondent's car violated the Fourth Amendment. The case raises profoundly significant questions concerning the relationship between two sovereigns— the State of Michigan and the United States of America.

The Supreme Court of the State of Michigan expressly held "that the deputies' search of the vehicle was proscribed by the Fourth Amendment to the United States Constitution and *art 1, §11 of the Michigan Constitution."* 413 Mich. 461, 472–473, 320 N. W. 2d 866, 870 (1982) (emphasis added).

---

[7] The police, for example, could have continued to detain respondent outside the car and asked him to tell them where his registration was. The police then could have retrieved the registration themselves. This would have resulted in an intrusion substantially less severe than the one at issue here.

The state law ground is clearly adequate to support the judgment, but the question whether it is independent of the Michigan Supreme Court's understanding of federal law is more difficult. Four possible ways of resolving that question present themselves: (1) asking the Michigan Supreme Court directly, (2) attempting to infer from all possible sources of state law what the Michigan Supreme Court meant, (3) presuming that adequate state grounds are independent unless it clearly appears otherwise, or (4) presuming that adequate state grounds are *not* independent unless it clearly appears otherwise. This Court has, on different occasions, employed each of the first three approaches; never until today has it even hinted at the fourth. In order to "achieve the consistency that is necessary," the Court today undertakes a reexamination of all the possibilities. *Ante,* at 1039. It rejects the first approach as inefficient and unduly burdensome for state courts, and rejects the second approach as an inappropriate expenditure of our resources. *Ante,* at 1039–1040. Although I find both of those decisions defensible in themselves, I cannot accept the Court's decision to choose the fourth approach over the third—to presume that adequate state grounds are intended to be dependent on federal law unless the record plainly shows otherwise. I must therefore dissent.

If we reject the intermediate approaches, we are left with a choice between two presumptions: one in favor of our taking jurisdiction, and one against it. Historically, the latter presumption has always prevailed. See, *e. g., Durley* v. *Mayo,* 351 U. S. 277, 285 (1956); *Stembridge* v. *Georgia,* 343 U. S. 541, 547 (1952); *Lynch* v. *New York ex rel. Pierson,* 293 U. S. 52 (1934). The rule, as succinctly stated in *Lynch,* was as follows:

> "Where the judgment of the state court rests on two grounds, one involving a federal question and the other not, or if it does not appear upon which of two grounds the judgment was based, and the ground independent of a federal question is sufficient in itself to sustain it, this

Court will not take jurisdiction. *Allen* v. *Arguimbau*, 198 U. S. 149, 154, 155; *Johnson* v. *Risk*, [137 U. S. 300, 306, 307]; *Wood Mowing & Reaping Machine Co.* v. *Skinner*, [139 U. S. 293, 295, 297]; *Consolidated Turnpike Co.* v. *Norfolk & Ocean View Ry. Co.*, 228 U. S. 596, 599; *Cuyahoga River Power Co.* v. *Northern Realty Co.*, 244 U. S. 300, 302, 304." *Id.*, at 54–55.

The Court today points out that in several cases we have weakened the traditional presumption by using the other two intermediate approaches identified above. Since those two approaches are now to be rejected, however, I would think that *stare decisis* would call for a return to historical principle. Instead, the Court seems to conclude that because some precedents are to be rejected, we must overrule them all.[1]

Even if I agreed with the Court that we are free to consider as a fresh proposition whether we may take presumptive jurisdiction over the decisions of sovereign States, I could not agree that an expansive attitude makes good sense. It appears to be common ground that any rule we adopt should show "respect for state courts, and [a] desire to avoid advisory opinions." *Ante*, at 1040. And I am confident that all Members of this Court agree that there is a vital interest in the sound management of scarce federal judicial resources. All of those policies counsel against the exercise of federal jurisdiction. They are fortified by my belief that a policy of judicial restraint—one that allows other decisional bodies to have the last word in legal interpretation until it is truly necessary for this Court to intervene—enables this Court to make its most effective contribution to our federal system of government.

The nature of the case before us hardly compels a departure from tradition. These are not cases in which an American citizen has been deprived of a right secured by the United

---

[1] A sampling of the cases may be found in the footnotes to my dissenting opinion in *South Dakota* v. *Neville*, 459 U. S. 553, 566 (1983). See also n. 4, *infra*.

States Constitution or a federal statute. Rather, they are cases in which a state court has upheld a citizen's assertion of a right, finding the citizen to be protected under both federal and state law. The attorney for the complaining party is an officer of the State itself, who asks us to rule that the state court interpreted federal rights too broadly and "overprotected" the citizen.

Such cases should not be of inherent concern to this Court. The reason may be illuminated by assuming that the events underlying this case had arisen in another country, perhaps the Republic of Finland. If the Finnish police had arrested a Finnish citizen for possession of marihuana, and the Finnish courts had turned him loose, no American would have standing to object. If instead they had arrested an American citizen and acquitted him, we might have been concerned about the arrest but we surely could not have complained about the acquittal, even if the Finnish court had based its decision on its understanding of the United States Constitution. That would be true even if we had a treaty with Finland requiring it to respect the rights of American citizens under the United States Constitution. We would only be motivated to intervene if an American citizen were unfairly arrested, tried, and convicted by the foreign tribunal.

In this case the State of Michigan has arrested one of its citizens and the Michigan Supreme Court has decided to turn him loose. The respondent is a United States citizen as well as a Michigan citizen, but since there is no claim that he has been mistreated by the State of Michigan, the final outcome of the state processes offended no federal interest whatever. Michigan simply provided greater protection to one of its citizens than some other State might provide or, indeed, than this Court might require throughout the country.

I believe that in reviewing the decisions of state courts, the primary role of this Court is to make sure that persons who seek to *vindicate* federal rights have been fairly heard. That belief resonates with statements in many of our prior cases.

In *Abie State Bank* v. *Bryan*, 282 U. S. 765 (1931), the Supreme Court of Nebraska had rejected a federal constitutional claim, relying in part on the state law doctrine of laches. Writing for the Court in response to the Nebraska Governor's argument that the Court should not accept jurisdiction because laches provided an independent ground for decision, Chief Justice Hughes concluded that this Court must ascertain for itself whether the asserted nonfederal ground independently and adequately supported the judgment "in order that constitutional guaranties may appropriately be enforced." *Id.*, at 773. He relied on our earlier opinion in *Union Pacific R. Co.* v. *Public Service Comm'n of Missouri*, 248 U. S. 67 (1918), in which Justice Holmes had made it clear that the Court engaged in such an inquiry so that it would not "be possible for a State to impose an unconstitutional burden" on a private party. *Id.*, at 70. And both *Abie* and *Union Pacific* rely on *Creswill* v. *Knights of Pythias*, 225 U. S. 246, 261 (1912), in which the Court explained its duty to review the findings of fact of a state court "where a Federal right has been denied."

Until recently we had virtually no interest in cases of this type. Thirty years ago, this Court reviewed only one. *Nevada* v. *Stacher*, 346 U. S. 906 (1953). Indeed, that appears to have been the only case during the entire 1953 Term in which a State even sought review of a decision by its own judiciary. Fifteen years ago, we did not review any such cases, although the total number of requests had mounted to three.[2] Some time during the past decade, perhaps about

---

[2] In *Commonwealth* v. *Dell Publications, Inc.*, 427 Pa. 189, 233 A. 2d 840 (1967), the Supreme Court of Pennsylvania held that the First and Fourteenth Amendments protected the defendant's right to publish and distribute the book "Candy." The Commonwealth petitioned to this Court, and we denied certiorari. 390 U. S. 948 (1968). In *People* v. *Noroff*, 67 Cal. 2d 791, 433 P. 2d 479 (1967), the Supreme Court of California held that the First and Fourteenth Amendments protected the defendant's right to distribute a magazine called "International Nudist Sun." The

the time of the 5-to-4 decision in *Zacchini* v. *Scripps-Howard Broadcasting Co.*, 433 U. S. 562 (1977), our priorities shifted. The result is a docket swollen with requests by States to reverse judgments that their courts have rendered in favor of their citizens.[3] I am confident that a future Court will recognize the error of this allocation of resources. When that day comes, I think it likely that the Court will also reconsider the propriety of today's expansion of our jurisdiction.

The Court offers only one reason for asserting authority over cases such as the one presented today: "an important need for uniformity in federal law [that] goes unsatisfied when we fail to review an opinion that rests primarily upon federal grounds and where the independence of an alleged state ground is not apparent from the four corners of the opinion." *Ante*, at 1040 (emphasis omitted). Of course, the supposed need to "review an opinion" clashes directly with our oft-repeated reminder that "our power is to correct wrong judgments, not to revise opinions." *Herb* v. *Pitcairn*, 324 U. S. 117, 126 (1945). The clash is not merely one of form: the "need for uniformity in federal law" is truly an ungovernable engine. That same need is no less present when

State petitioned to this Court, and we denied certiorari. 390 U. S. 1012 (1968). In *State* v. *Franc*, 165 Colo. 69, 437 P. 2d 48 (1968), the Supreme Court of Colorado held that under Colorado law title in a certain piece of property should be quieted in a citizen. The State petitioned to this Court, and we denied certiorari. 392 U. S. 928 (1968).

[3] This Term, we devoted argument time to *Florida* v. *Royer*, 460 U. S. 491 (1983); *Illinois* v. *Gates*, 462 U. S. 213 (1983) (argued twice); *Connecticut* v. *Johnson*, 460 U. S. 73 (1983); *Missouri* v. *Hunter*, 459 U. S. 359 (1983); *South Dakota* v. *Neville*, 459 U. S. 553 (1983); *Texas* v. *Brown*, 460 U. S. 730 (1983); *California* v. *Ramos, ante*, p. 992; *Florida* v. *Casal*, 462 U. S. 637 (1983); *City of Revere* v. *Massachusetts General Hospital, ante*, p. 239; *Oregon* v. *Bradshaw*, 462 U. S. 1039 (1983); *Illinois* v. *Andreas, ante*, p. 765; *Illinois* v. *Lafayette*, 462 U. S. 640 (1983), as well as this case. And a cursory survey of the United States Law Week index reveals that so far this Term at least 80 petitions for certiorari to state courts were filed by the States themselves.

it is perfectly clear that a state ground is both independent and adequate.   In fact, it is equally present if a state prosecutor announces that he believes a certain policy of nonenforcement is commanded by federal law.   Yet we have never claimed jurisdiction to correct such errors, no matter how egregious they may be, and no matter how much they may thwart the desires of the state electorate.   We do not sit to expound our understanding of the Constitution to interested listeners in the legal community; we sit to resolve disputes.   If it is not apparent that our views would affect the outcome of a particular case, we cannot presume to interfere.[4]

---

[4] In this regard, one of the cases overruled today deserves comment.   In *Minnesota* v. *National Tea Co.*, 309 U. S. 551 (1940), the Court considered a case much like this one—the Minnesota Supreme Court had concluded that both the Fourteenth Amendment to the United States Constitution and Art. 9, § 1, of the Minnesota Constitution prohibited a graduated income tax on chainstore income.   The state court stated that "th[e] provisions of the Federal and State Constitutions impose identical restrictions upon the legislative power of the state in respect to classification for purposes of taxation," and "then adverted briefly to three of its former decisions which had interpreted" the state provision.   309 U. S., at 552–553. It then proceeded to conduct a careful analysis of the Federal Constitution. It could justly be said that the decision rested primarily on federal law. Cf. *ante*, at 1042.   The majority of the Court reasoned as follows:

"Enough has been said to demonstrate that there is considerable uncertainty as to the precise grounds for the decision.   That is sufficient reason for us to decline at this time to review the federal question asserted to be present, *Honeyman* v. *Hanan*, 300 U. S. 14, consistently with the policy of not passing upon questions of a constitutional nature which are not clearly necessary to a decision of the case."   309 U. S., at 555.
The Court therefore remanded to the state court for clarification.

Today's Court rejects that approach as intruding unduly on the state judicial process.   One might therefore expect it to turn to Chief Justice Hughes' dissenting opinion in *National Tea*.   In a careful statement of the applicable principles, he made an observation that I find unanswerable:

"The fact that provisions of the state and federal constitutions may be similar or even identical does not justify us in disturbing a judgment of a state court which adequately rests upon its application of the provisions of

Finally, I am thoroughly baffled by the Court's suggestion that it must stretch its jurisdiction and reverse the judgment of the Michigan Supreme Court in order to show "[r]espect for the independence of state courts." *Ante*, at 1040. Would we show respect for the Republic of Finland by convening a special sitting for the sole purpose of declaring that its decision to release an American citizen was based upon a misunderstanding of American law?

I respectfully dissent.

---

its own constitution. That the state court may be influenced by the reasoning of our opinions makes no difference. The state court may be persuaded by majority opinions in this Court or it may prefer the reasoning of dissenting judges, but the judgment of the state court upon the application of its own constitution remains a judgment which we are without jurisdiction to review. Whether in this case we thought that the state tax was repugnant to the federal constitution or consistent with it, the judgment of the state court that the tax violated the state constitution would still stand. It cannot be supposed that the Supreme Court of Minnesota is not fully .conscious of its independent authority to construe the constitution of the State, whatever reasons it may adduce in so doing." *Id.*, at 558–559.