**Boris F. NAVRATIL, Plaintiff,**

v.

**Randy PARKER, individually and as a sheriff's deputy, Defendant.**

**Civ. A. No. 86–M–1342.**

United States District Court,
D. Colorado.

Dec. 12, 1989.

James Leventhal, Leventhal & Bogue, P.C., Denver, Colo., for plaintiff.

David R. Brougham, Hall & Evans, Denver, Colo. and James R. Fritze, Acting Eagle County Atty., Eagle, Colo., for defendant.

## MEMORANDUM OPINION
## AND ORDER

MATSCH, District Judge.

This is an action under 42 U.S.C. § 1983 with state law claims brought under diversity jurisdiction. The suit arises from a traffic stop. On the evening of January 25, 1986, Eagle County Sheriff's Lieutenant Randy Parker (Parker), on patrol in a police vehicle, heard on his radio that a large dark car was heading west on I–70 at a high rate of speed. About 20 to 30 minutes later, Parker saw an automobile of that description. That vehicle was occupied by three persons: the plaintiff, Boris F. Navratil (Navratil); his son, John Navratil, who was driving; and John Navratil's fiancée. Parker radioed to nearby Eagle Police officer David Pierson (Pierson), who was parked farther west on I–70, requesting him to take a radar speed check. Pierson radioed to Parker that the car was travelling in excess of the speed limit. *See* D. Pierson Dep. at 13; Transcript of Trial held June 26, 1987, County Court, Eagle County, Colorado ("Trial Tr."), at 4. John Navratil disputes that his speed was checked by radar because his radar detector did not go off, and because the occupants did not see any cars on the ramp where Pierson claims to have been parked. John Navratil also denies that he was speeding. Navratil states that he did not look at the speedometer of the car so he does not know if the car was speeding. However, the plaintiff does not dispute that Pierson reported back to Parker that the Navratil car was travelling in excess of the speed limit.

After hearing the report, Parker followed the car and shined his spotlight on it to get the driver to pull over. Parker claims that he had his roof lights on, but that is disputed. While Parker was following the car, he saw an object being passed from the front to the back seat. John Navratil acknowledged that he passed a radar detector to the plaintiff in the back seat.

John Navratil stopped the car and got out. The plaintiff also got out of the car. Parker told him to get back in. Navratil

says that Parker was rude. Navratil asked why the car had been stopped. Parker repeatedly told Navratil to return to his car, and Navratil repeatedly asked why they had been stopped. Finally, Navratil got back in the car. Parker took John Navratil's driver's license and returned to his police car.

Several minutes later, after Parker came back to the Navratil car, Navratil got out, and walked towards Parker and John Navratil in order to give a coat to John. Navratil admits that he was agitated and waved his arms for emphasis. Navratil Dep. at 60. More police officers arrived on the scene. John Navratil said to his father "Dad, why don't you get back in the car and let me finish up." Navratil Dep. at 62. Parker's police dog came out from Parker's car and stood next to Parker, who restrained him. The plaintiff claims that Parker let the dog out of the car, while Parker claims that the dog was following his training to jump out of the open window of the back seat of the police car when he sensed danger. After his son's suggestion, and further orders from Parker, Navratil returned to his car.

Navratil came out of the car a third time, "To tell Parker to buzz off and let us go on our way." Navratil Dep. at 69. He was agitated and "may have chopped the air ... for emphasis." Navratil Dep. at 70. John Navratil stated that his father "slapped the trunk of the car ... two or three times," J. Navratil Dep. at 37, although Navratil denies this. Parker told him to get back into his car or he would be arrested. Navratil Dep. at 69–70. At this point, the car had been stopped for ten to fifteen minutes. Navratil then said "Look if you're going to arrest me, let's do it and let's get it over with and let's be on our way." Navratil Dep. at 74. Navratil was arrested and handcuffed. Parker searched the interior of the car. Navratil was taken to jail, and John Navratil followed in his car. Navratil posted bond and was released, and John Navratil was issued a warning ticket.

Navratil was first charged for violating Colo.Rev.Stat. § 42–4–105, which at that time provided: "No person shall willfully fail or refuse to comply with any lawful order or direction of any police officer invested by law with authority to direct, control, or regulate traffic. Any person who violates any provisions of this section commits a class 2 traffic offense." The county court dismissed that charge, ruling that the prohibition applied only to a police officer who was actually directing motorists or pedestrians.

Navratil was then charged with a violation of Colo.Rev.Stat. § 18–8–104, which provides: "a person commits obstructing a peace officer or fireman when, by using or threatening to use violence, force, or physical interference, or obstacle, he knowingly obstructs, impairs, or hinders the enforcement of the penal law or the preservation of the peace by a peace officer, acting under color of his official authority...." Navratil moved to suppress evidence based on allegations that the stop and arrest were without probable cause. That motion was denied. Trial Tr. at 22. Navratil was convicted after a jury trial in county court on June 26, 1987. That conviction was reversed by the district court's conclusion that the issuance of a warning ticket was not the enforcement of a penal law.

Parker has moved for summary judgment under Fed.R.Civ.P. 56 on all the plaintiff's claims.

### I. The Federal Claim

The plaintiff contends that shining the spotlight into his car was an invasion of his right to privacy. In *Texas v. Brown*, 460 U.S. 730, 740–41, 103 S.Ct. 1535, 1542–43, 75 L.Ed.2d 502 (1983) (plurality opinion) (Rehnquist, J.) the Court held that a police officer who shined a flashlight into a car violated no fourth amendment right: "[t]here is no legitimate expectation of privacy ... shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." (citations omitted). Although *Brown* was a plurality opinion, apparently all members of the Court agreed with this point. *See* 460 U.S. at 746, 103 S.Ct. at 1545 (Powell,

J., concurring in the judgment); 460 U.S. at 740, 103 S.Ct. at 1542 (Stevens, J., concurring in the judgment). Accordingly, *Brown* is controlling. If there is some other constitutional right of privacy that might prohibit police from shining flashlights into or on cars, it is not clearly established and thus Parker is entitled to qualified immunity on this claim. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■ From Parker's perspective, he had probable cause to stop the Navratil automobile. While there is a genuine dispute about whether John Navratil was speeding, there is no dispute that Pierson reported that the vehicle was exceeding the speed limit. A reasonable police officer in Parker's position would have exercised his authority to stop the Navratil automobile.

■ Navratil also seeks damages for the search of the automobile. Under *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), an officer may search the car for his own safety if he has a reasonable belief that there may be a weapon in the car. In this case two facts contribute to the reasonable suspicion: first, Parker saw an object passed from the front seat to the back during the period the Navratils were being followed, second, Navratil was admittedly agitated and refused to remain in his car in spite of the fact that he was not being issued a ticket. The circumstances sufficiently support the defendant's suspicion to provide qualified immunity. *Anderson v. Creighton*, 483 U.S. 635, 638–39, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987).[1]

■ Navratil alleges that his arrest was without probable cause. Again, Parker is protected by qualified immunity because a reasonable police officer may conclude that § 42–4–105 prohibited the plaintiff's con-

duct. *See, e.g., England v. Hendricks*, 880 F.2d 281, 284 (10th Cir.1989).

■ Navratil also claims that the defendant used unreasonable and excessive force. Under *Graham v. Connor*, —— U.S. ——, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989), a claim of excessive force in making an arrest must be evaluated under the fourth amendment proscription of unreasonable searches and seizures. The claim fails for lack of an allegation, or evidence, that Navratil was subjected to unreasonable force. No physical contact of any kind is alleged in the complaint. In his deposition, Navratil asserts that his wrists became numb from handcuffs. No medical attention was necessary and Navratil never asked that the handcuffs be loosened or complained that they were too tight. Where, as here, the decision to arrest was objectively reasonable, handcuffing the arrestee does not constitute unreasonable force. The mere presence of a police dog, while intimidating, is not excessive force.

The plaintiff's final federal theory is outrageous conduct. He has not articulated any rights protected by federal law that were infringed by the conduct asserted as outrageous. At any rate, since Parker's actions, analyzed separately, are within the scope of his qualified immunity, that defense protects him from liability on a claim that the cumulative effect could be considered outrageous conduct.

## II. The State Law Claims

■ As the parties agree, Colorado law applies to the remaining claims. Navratil alleges that he was the victim of an assault. The only acts alleged that could conceivably constitute assault are the presence of the police dog and of the other officers who appeared at the scene. According to Navratil and his son, the dog never touched either of them, and was re-

---

**1.** Navratil suggests that Parker did not act in subjective good faith because he told Navratil to get back in the car, which he would not have done if he thought that there was a weapon there. Parker addressed that issue at Navratil's criminal trial, stating that "it's our policy to have the people stay in the vehicle for officer safety ... it's safer to keep them contained in

the area for the officer. That way the guy is not moving around...." Trial Tr. at 32. The search apparently took place after the other officers had arrived on the scene. Further, under *Anderson v. Creighton,* the issue is not whether the search was in subjective good faith, but whether it was objectively reasonable.

strained by Parker. John Navratil stated that he did not recall the dog ever growling or showing its teeth. J. Navratil Dep. at 46–47. He also testified that "the mishandling of the dog was getting the dog out of the car." J. Navratil Dep. at 48. At the criminal trial, John Navratil was asked if the dog was threatening, and he replied "It—You know, no one was going to argue with that dog." "Did the dog drool or snarl or anything like that?" "No. The dog did not. The dog was being appropriately handled." Trial Tr. at 148. Parker is no more liable for having a trained attack dog with him when it was arguably not necessary than any other police officer would be liable for assault for possessing a revolver or nightstick under circumstances when no weapons of any kind were necessary. The public policy of the state of Colorado is to permit its peace officers to be armed. *See* Colo.Rev.Stat. § 18–12–101(2); Colo.Rev.Stat. § 18–12–102(5); Colo.Rev.Stat. § 18–12–105(2)(d) & (e) (provisions allowing peace officers to possess weapons). Where, as here, the weapons are not used in what objectively could be considered a threatening or intimidating manner, there is no assault.

■ For the same reason, Parker's decision to call for additional officers was not an assault. People may be intimidated by a police show of force, but it is inconceivable that a police officer's judgment as to how much assistance he needs can be second-guessed by a court in the absence of some threatening behavior. There is no evidence that the other officers were doing anything but standing nearby. Boris Navratil's individual sensitivity is not the measure for determining the defendant's liability.

Navratil claims invasion of privacy. In *Rugg v. McCarty*, 476 P.2d 753, 755 (Colo. 1970) the court allowed a claim for invasion of privacy to proceed where "*unreasonable action* ... is taken which foreseeably will probably result in extreme mental anguish, embarrassment, humiliation or mental suffering and injury to a person possessed of *ordinary sensibilities,* under the same or similar circumstances...." (emphasis in original) (citations omitted). *See also Otten v. Birdseye,* 527 P.2d 925, 927 (Colo.App.1974) (affirming dismissal of invasion of privacy claim where actions "would not foreseeably result in extreme mental anguish, embarrassment, humiliation, or mental suffering"). The only allegation in the complaint that could possibly implicate this interest is that "Parker directed a high intensity searchlight into plaintiff's car." A car on the highway is not a cloister. Automobiles are equipped with powerful headlights that can shine through the window of another car, illuminating its interior. Further, as the Supreme Court noted in *Texas v. Brown,* 460 U.S. 730, 740, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983) (plurality opinion), cars have windows, which permit persons nearby to see inside. The plaintiff's allegations evidence no hope of meeting the *Rugg* standard, because the average person would not suffer extreme mental humiliation from the shining of a light into the automobile in which he was a passenger.

■ Parker asserts that the remaining claims are barred by statutory immunity. Colo.Rev.Stat. § 24–10–118(2) provides that

[a] public employee shall be immune from liability in any claim for injury ... which lies in tort or could lie in tort ... and which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment unless the act or omission causing such injury was willful and wanton....

None of the exceptions, listed in Colo.Rev. Stat. § 24–10–106(1), is relevant here.

The Colorado common law rule was that government employees are immune for discretionary acts unless they are willful or wanton. *See, e.g., Leake v. Cain,* 720 P.2d 152, 163 (Colo.1986). The statute provides immunity for *all acts* by the employee performing duties within the scope of employment unless the act was willful or wanton. The requirement that the acts be discretionary has been eliminated.

In this case, all of Parker's actions were performed while he was on duty and acting within the scope of his employment. Ac-

cordingly, the only question is whether the plaintiff has shown sufficient support for a jury to find that Parker's actions were willful or wanton. There has been no judicial interpretation of the term "willful and wanton" in the context of this statute. However, in the exemplary damages statute, Colo.Rev.Stat. § 13–21–102, there is a definition of willful and wanton conduct:

> As used in this section, "willful and wanton conduct" means conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff.

Colo.Rev.Stat. § 13–21–102(1)(b). Although not directly applicable to this case, it is probable that when the Colorado legislature uses identical terms in different statutes they are intended to have the same or similar meanings.

Colorado courts have construed the term similarly in other contexts. In *Pettingell v. Moede*, 129 Colo. 484, 271 P.2d 1038, 1042 (1954) the Colorado Supreme Court defined "willful and wanton" as used in the automobile guest statute as follows:

> Willful action means voluntary; by choice; intentional; purposeful. Wantonness signifies an even higher degree of culpability in that it is wholly disregardful of the rights, feelings and safety of others. It may, at times, even imply an element of evil. One may be said to be guilty of "wilful [sic] and wanton disregard" when he is conscious of his misconduct, and although having no intent to injure any one, from his knowledge of surrounding circumstances and existing conditions is aware that his conduct in the natural sequence of events will probably result in injury to his guest, and is unconcerned over the possibility of such result.... To be "wilful [sic] and wanton" there must be some affirmative act purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others....

See also *People v. Marcy*, 628 P.2d 69, 79 (Colo.1981) ("A level of culpability that is more than reckless, but less than intentional, traditionally has been characterized as willful conduct.... Willful conduct ... is the equivalent of acting 'knowingly' ") (citations omitted); *Shoemaker v. Mountain States Tel. & Tel. Co.*, 38 Colo.App. 321, 559 P.2d 721, 724 (1976) (defining willful and wanton as a "mental state of the actor consistent with purpose, intent, and voluntary choice") (citing *Pettingell* )); *ANR Prod. Co. v. Westburne Drilling, Inc.*, 581 F.Supp. 542, 548 (D.Colo.1984) (Arraj, J.) (defining willful and wanton). Accordingly, Parker is liable only if he acted not only unlawfully, but with the intent to injure, or in conscious disregard of the probability that his acts would result in injury to the plaintiff.

Navratil pleads a claim of negligence, but has confessed judgment on this claim. *See* Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, at 10 n. 5. Since negligence is by definition not willful and wanton, Parker is clearly immune. Navratil alleges false arrest and false imprisonment, and related torts. The injury that must have been willfully and wantonly caused is being subjected to an unlawful arrest, for being lawfully arrested is not a cognizable harm. Evidence that Parker knew the arrest was illegal would be the most direct evidence of willful and wanton conduct, but there is no evidence of subjective knowledge.

The circumstances of an incident often constitute the only available evidence on the issue of the state of mind of the actor. The circumstances of this case do not support an inference that the defendant acted willfully and wantonly. Navratil was arrested for violation of Colo.Rev.Stat. § 42–4–105, prohibiting disobedience to police officers. When Parker made the arrest, no reported opinion had limited § 42–4–105 to disobedience to actual traffic directions, as opposed to instructions incident to controlling traffic. Accordingly, Navratil was arrested based on an objectively reasonable interpretation of the statute. Although Parker's view was not adopted by the county court, to date no

reported Colorado appellate court decision has limited the statute in that way.

Further, an officer in Parker's position could have thought that Colo.Rev.Stat. § 18–8–105 justified making an arrest for interference with writing a warning ticket. In *People v. Shockley*, 591 P.2d 589, 591 (Colo.App.1978), the court concluded that "the term 'enforcement' as used in the statute encompasses those activities which a peace officer is under a duty to perform in order to give effect to a penal law." It is by no means obvious that the issuance of a warning ticket does not contribute to giving effect to the law prohibiting speeding. While the district court concluded that interference with the warning ticket was not a violation of the statute, the county court denied a motion to suppress based in part on a lack of probable cause for the arrest. Trial Tr. at 22. The county court permitted the prosecution to go forward, and the jury convicted, all on the theory that interference with a warning ticket was an interference with enforcement of the penal law. These facts suggest that Parker's view of the statute was not unreasonable. Assuming that the Colorado Supreme Court would conclude that the statutes at issue do not apply to Navratil's conduct, it would do so based on sophisticated legal reasoning. That Parker failed to anticipate such analysis does not suggest that his actions constituted willful and wanton misconduct.

Navratil's allegations of fact do not otherwise suggest that Parker willfully and wantonly arrested Navratil illegally. Under Navratil's version of the facts Parker was rude, but nothing in Navratil's allegations suggests that Parker had an invidious motive for arresting Navratil, or that Parker was searching for an excuse to arrest Navratil. There is no evidence contradicting Parker's testimony at the trial that his purpose in ordering Navratil to return to the car was to protect himself from possible harm. Moreover, it was Navratil who initiated the exchanges with Parker that resulted in the arrest. It was only after warning Navratil that he would be arrested if he failed to stay in the car, and after Navratil asked to be arrested, that Parker took the plaintiff into custody.

The facts as alleged by Navratil are entirely consistent with Parker's good faith, and none suggest an improper purpose. If the facts were susceptible to either of two interpretations, the existence of willful and wanton conduct would be a jury question. But here, any finding of willful and wanton misconduct in this case would be based on speculation, rather than fair inference from the evidence. Accordingly, the false imprisonment claim against Parker is barred by immunity.

■ Navratil alleges that Parker committed a battery against him, claiming that Parker used excessive and unreasonable force during and after the arrest. At his deposition, Navratil was asked "[w]as there any physical contact between you and Officer Parker other than when he touched you to put the handcuffs on?" The answer: "No." Navratil Dep. at 78. From the plaintiff's briefs, it is clear that the force complained of is the presence of the dog and backup officers, and the loudness of Parker's voice. These things do not constitute battery because they do not involve any physical contact. Accordingly, the battery claim fails to state a claim.

The only force mentioned in the briefs and deposition testimony is the use of handcuffs, which is neither pleaded in the complaint nor raised in the pre-trial order. Navratil said in a deposition that his wrists became numb from the handcuffs, but he did not seek medical attention after his release, and he did not tell any officers that they were too tight. Navratil Dep. at 78. There is no evidence upon which a jury could find that Navratil was handcuffed in spite of Parker's knowledge that there was no probable cause for arrest, and thus that there was no privilege to handcuff Navratil. Therefore, even if this allegation were in the pleadings, Parker would be immune from liability.

The final substantive claim is outrageous conduct. To state a claim, the plaintiff must allege "conduct ... so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency,

and to be regarded as atrocious, and utterly intolerable in a civilized community." *Rugg v. McCarty*, 173 Colo. 170, 476 P.2d 753, 756 (Colo.1970) (quoting Restatement (Second) of Torts § 46, comment d at 73). The distress must be caused intentionally or recklessly. *See Rubenstein v. South Denver Nat. Bank*, 762 P.2d 755, 757 (Colo. App.1988). Presumably, the outrageous conduct is the result of an aggregation of all the other torts alleged. On the facts alleged here this claim must be dismissed because there is no genuine issue of material fact that Parker went beyond the bounds of reasonable police procedure in making an arrest, or that the arrest or any of the associated acts were willful and wanton.

The final claim is for punitive damages. It fails because there is no surviving substantive cause of action. *See Palmer v. A.H. Robins Co.*, 684 P.2d 187, 213–14 (Colo.1984).

Upon the foregoing, it is ORDERED that the defendant's motion for summary judgment is granted.