**UNITED STATES of America,
Plaintiff,**

v.

**Gregory HARRIS, Defendant.**

No. CR–3–97–082.

United States District Court,
S.D. Ohio,
Western Division.

March 1, 2000.

John H. Rion, Jon P. Rion, Dayton, OH, for Plaintiff.

David J. Horne, Cincinnati, OH, for Defendant.

## DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (DOC. # 13); DIRECTIVE TO GOVERNMENT COUNSEL

RICE, Chief Judge.

The Defendant is charged in the Indictment (Doc. # 6) with three counts of possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841.[1] The three charges arise out of the seizure of evidence from the Defendant's automobile on October 31, 1997. On that date, Officer Michael Payne ("Payne") of the Dayton Police Department stopped that vehicle and, while searching it, discovered controlled substances and currency.

According to Payne, he searched the Defendant's automobile because he feared that weapons were located therein. The Defendant has filed a motion, requesting that this Court suppress all evidence seized on that date. On June 5 and 12, 1998, this Court conducted an oral and evidentiary hearing on the Defendant's motion. Thereafter, the Court established a briefing schedule (*see* Doc. # 30), with which the parties have complied. *See* Docs. # # 34 and 36. The Court now rules upon the Defendant's Motion to Suppress Evidence (Doc. # 13).

Shortly after noon on October 31, 1997, Payne was in his marked cruiser, facing southbound on North Williams, while stopped at the intersection of West Riverview, when he observed a red Camaro parked along the east curb of North Williams. Transcript of June 5, 1998 Hearing ("Doc.# 31") at 5. A window was down on that vehicle. *Id.* After looking at that automobile for approximately one minute, Payne saw an individual, who would subsequently be identified as the Defendant, walking from some houses toward the red Camaro. *Id.* at 5. The Defendant was walking casually and carrying a small blue bag or pouch. *Id.* at 8. When he got to the red Camaro, the Defendant entered it and drove away. *Id.*

However, Payne's suspicions had been aroused. As is indicated, he had noticed that a window on the automobile was down. The officer testified that car thefts were a common occurrence in the area in which he had observed the red Camaro and that thieves would sometimes break windows of vehicles in order to enter them. *Id.* at 7. Thus, Payne feared that the red Camaro might be stolen. *Id.* In addition, he had not seen a license plate on the front bumper of the vehicle. *Id.* at 6. Payne also testified that when he passed the car, he had observed "an area where you fill

---

1. The three counts charge the Defendant with possession of crack cocaine (Count 1), co-

caine (Count 2) and heroin (Count 3).

the car up with gas," rather than the rear license plate. *Id.* at 8. Consequently, Payne made a U-turn on North Williams and followed the red Camaro as it turned onto West Riverview. *Id.* at 9. Payne activated the emergency lights on his cruiser; however, the driver of the red Camaro did not stop his vehicle. *Id.* A few seconds later, Payne sounded his air horn, "which got [the driver's] attention," causing him to pull to the curb of West Riverview within a couple of seconds. *Id.* at 9–10. Payne testified that he stopped the Defendant, because his vehicle had no visible license plates and, further, because the Defendant was not wearing his seat belt. *Id.* at 10.

Payne then left his vehicle and walked to driver's side of the red Camaro, where he met the Defendant who had his driver's license in one hand and a cellular telephone in the other. *Id.* at 10. The Defendant was talking on that telephone. *Id.* In response to a question from Payne, the Defendant indicated that he owned the car. *Id.* at 11. Payne told the Defendant to remain in the vehicle and walked to its rear, where he observed that the license plate had been flipped down. *Id.* According to Payne, one puts gasoline in a Camaro by flipping the rear license plate down and exposing the gas cap. *Id.* Payne returned to the Defendant, who remained seated in the vehicle, and asked him whether he had put gasoline in the car that day. According to Payne, the Defendant indicated that he had probably forgotten to put the license plate back up. *Id.*

Payne then returned to his cruiser, where he was able to enter the information he had obtained during the stop into his computer and learned that the license plates had been issued to the Camaro. *Id.* at 12, 27. While Payne was performing that task, Officer Clarence Keller ("Kel-

ler") of the Dayton Police Department arrived on the scene, and Payne signaled to his fellow officer that he was in need of assistance. *Id.* at 12. The two officers then walked to the front of Defendant's vehicle and asked him to step out of it. *Id.* After the Defendant had complied with that request, Payne asked whether he had any guns, knives or anything illegal on his person, and patted the Defendant down, finding no weapons. *Id.* That officer also asked the Defendant whether anything illegal, such as guns, knives or anything Payne needed to know about, was inside the red Camaro.[2] *Id.* at 13. While the Defendant and Keller stood on the sidewalk near the car, Payne proceeded to search the Defendant's car, initially finding nothing under the driver's seat or on the floor. *Id.* Undaunted, Payne opened the center console in the automobile, discovering a blue bag located therein. *Id.* at 13–14. When he picked up the bag, Payne felt a long hard object, which, according to his testimony, he feared was a gun.[3] *Id.* at 14. Since the bag had a zipper which was almost completely closed, Payne was not able to see or to identify the long, hard object. *Id.* Therefore, he unzipped the bag and discovered a number of packages of what he believed to be crack cocaine. *Id.* The long, hard object turned out to be a set of scales. *Id.* After having discovered the crack cocaine, Payne informed Keller that the Defendant was under arrest for possession of that controlled substance. *Id.* After the Defendant had been arrested and placed in the back of Keller's cruiser, Payne resumed his search of the car, discovering a grocery bag containing bundles of United States currency under the front passenger's seat. *Id.*

The Defendant requests that the Court suppress all of the evidence that was

---

2. In response, the Defendant questioned why the officers were asking him those questions. Doc. # 31 at 13. However, the Defendant also told the officers that he was not armed. Transcript of June 12, 1998 Hearing (Doc. # 32) at 14.

3. When the Defendant observed Payne pick up the blue bag, he charged off the sidewalk; however, Keller was able to restrain him. Doc. # 31 at 14.

seized from his automobile on October 31, 1997. In his post-hearing memorandum, the Defendant sets forth three arguments, to wit: 1) the initial stop of his vehicle was not valid under the Fourth Amendment; 2) the search of his vehicle was not based upon articulable facts which supported a reasonable belief by Payne that he (the Defendant) might be armed; and 3) since it was not readily apparent that the long, hard object, which Payne had felt in the blue bag, was contraband, opening the bag was not justified.[4] This Court finds that the Defendant's second argument is dispositive of his motion; therefore, it limits its consideration to the question of whether the search of the interior of the Defendant's vehicle was constitutionally valid.

■ As is indicated, Payne testified that he stopped the Defendant's vehicle, because it was not displaying visible license plates and the Defendant was not wearing his seat belt. This Court will accept that testimony for present purposes. In addition, Payne had initially noticed the red Camaro, because its window was down on a cool day in late October. Given that car thefts were not uncommon in the area that Payne had first observed that vehicle, those facts conceivably constituted a reasonable suspicion that criminal activity had occurred, giving Payne additional justification for stopping the vehicle. This Court need not resolve that question, since the failure of the Defendant to display license plates on the red Camaro, alone, provided justification to Payne for stopping that car. Ohio law prohibits the operation of a motor vehicle on which the front and rear license plates are not displayed "in plain view." Ohio Rev Code § 4503.21. Therefore, this Court begins with the premise that Payne did not violate the Defendant's rights un-

der the Fourth Amendment, by stopping the red Camaro he was driving. Of course, the question still remains whether that officer violated those rights by searching that vehicle.

■ One might argue that the search of the red Camaro was permissible, because Payne had a reasonable suspicion that it had been stolen. Such an argument would be fruitless, since, before he commenced his search, Payne had discovered it was not stolen (the proper license plates were on that vehicle and the officer had learned that it was registered to the Defendant). Rather, Payne testified that he searched the red Camaro, because he feared that weapons might be located therein. However, to be valid, the search of Defendant's vehicle need not be supported by probable cause to believe that a crime either had or was taking place. In *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Supreme Court extended the rule established in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to a protective search of the passenger compartment of an automobile, in order to ascertain whether weapons were located therein. In *Long*, two officers were on patrol late at night in a rural area, when they observed an automobile being driven erratically at an excessive speed. When the automobile turned down a side road, it swerved into a shallow ditch. The officers stopped to investigate and were met at the rear of the automobile by the defendant, its sole occupant. When the officers asked the defendant to produce his driver's license, he did not initially respond, although he complied with their second such request. He also failed to respond to their initial request to provide the vehicle registration. When the officers

---

4. In his motion, the Defendant also requested that the Court suppress any statements which he may have made during this encounter, since he had not been provided *Miranda* warnings before making those statements. *See* Doc. # 13. Since the Defendant has failed to address that argument in his post-hearing memorandum (Doc. # 34), it has

been waived. Parenthetically, during the evidentiary hearing, the only statements by the Defendant, about which testimony was presented at the hearing, were that he owned the vehicle, that he had forgotten to flip-up his license plates and that no weapons were in his vehicle.

asked a second time, the defendant, who appeared to be under the influence of an intoxicant, began to walk toward the open driver's side door of the vehicle. The officers followed and, through that open door, they saw a large hunting knife on the floor of the automobile. At that point, the officers stopped the defendant and subjected him to a pat down for weapons, finding none. One of the officers then took the defendant to the rear of the vehicle, while the other shined his flashlight through the open door in an effort to ascertain whether other weapons were located inside the car. When he observed something protruding from under an armrest on the front seat, he entered the vehicle, lifted the armrest and discovered a pouch of marijuana. The defendant was then arrested for possession of marijuana.[5] The defendant moved to suppress the evidence that had been seized from his vehicle and, after that motion had been denied, was convicted for possession of marijuana. Upon appeal, the Michigan Supreme Court reversed, reasoning that the protective search of the passenger compartment for weapons was not justified by *Terry*, since that decision was limited to instances where the officers pat down a person. Upon further appeal, the United States Supreme Court reversed, writing:

Our past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. See *Terry*, 392 U.S. at 21[, 88 S.Ct. 1868]. "[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. at 27[, 88 S.Ct. 1868].

*Id.* at 1049–50, 103 S.Ct. 3469.[6] The *Long* Court also concluded that the facts set forth above constituted "specific and articulable" facts upon which the officers' reasonable belief was based.[7] Thus, under

---

**5.** The officers also impounded the vehicle. When it was subsequently searched more thoroughly, 75 pounds of marijuana were discovered in the trunk.

**6.** As the Government argues, it is irrelevant that the Defendant was outside of his vehicle and in the control of Keller when Payne conducted the search. Indeed, the defendant in *Long* was standing outside his car with one officer, when the other searched that vehicle.

**7.** In *Knowles v. Iowa*, 525 U.S. 113, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998), the Supreme Court declined to recognize a "search incident to a citation" exception to the warrant requirement contained within the Fourth Amendment. Therein, a police officer stopped the defendant's vehicle for speeding. After having issued the defendant a traffic citation, the officer conducted a full search of the car, discovering a bag of marijuana and a "pot pipe." The defendant was then arrested

and charged with violating state statutes outlawing the possession of controlled substances. Before his trial, the defendant moved to suppress the evidence that had been seized from his car. The trial court denied that motion and, subsequently, found the defendant guilty. Upon appeal, the Iowa Supreme Court affirmed the defendant's conviction, concluding that the trial court had properly overruled the defendant's motion to suppress, since Iowa statutes, as interpreted by that court, permitted an officer to search a vehicle after having issued a citation. The Iowa Supreme Court reasoned that such a search was constitutionally permissible, because the officer could have arrested the defendant rather than issuing him a citation and, further, given that a search incident to an arrest was a recognized exception to the warrant requirement. Upon further appeal, the United States Supreme Court reversed, concluding that a "search incident to a citation" exception was not necessary to protect

*Long,* this Court must decide whether Payne had a reasonable belief, based upon "specific and articulable" facts, that weapons might be located inside the red Camaro and that as a result his safety and that of others was in danger.[8] To resolve that question, the Court must first decide whether Payne's belief was based upon "specific and articulable" facts.

During the evidentiary hearing, Payne initially testified that after he had sounded his air horn, he had observed the Defendant "immediately shoving his hands from the console, to his lap, console to the lap, a couple of times, in a very aggressive manner." Doc. # 31 at 9–10. Payne indicated that the Defendant did that two or three times. *Id.* at 10. According to Payne, that activity caused him to fear that the Defendant had put a weapon in his lap or in the center console.[9] *Id.* at 13. On cross-examination, Payne qualified his earlier testimony. He conceded that he was

seated in cruiser, two car-lengths behind the Defendant's vehicle, with both vehicles moving, when he observed those movements. Transcript of June 12, 1998 Hearing ("Doc.# 32") at 19–20. Payne also conceded that he was able to observe only the Defendant's head and shoulders at the time, and could not see his arms and hands. *Id.* at 20–21. Thus, Payne's testimony that he had seen the Defendant move his hands from his lap to the console two or three times is simply not credible. Moreover, although Payne attempted to amend his earlier testimony to indicate that he had merely seen the Defendant move his shoulder in a quick manner (*see Id.* at 21), this Court does not find that attempt to be credible. This Court is not willing to believe the "back up" version of events presented by a witness whose initial version has proved to be unbelievable, as a result of cross-examination.[10]

the arresting officers or to prevent the destruction of evidence (the two reasons which support the "search incident to an arrest" exception). In the course of its decision, the *Knowles* Court reaffirmed *Long. Id.* at 118, 119 S.Ct. 484. Herein, Payne did not issue a citation to the Defendant, since before doing so, that officer discovered crack cocaine in the Defendant's automobile and arrested him for possession of controlled substances.

**8.** It bears emphasis that *Long* is limited to searching an automobile for weapons, since the "sole justification of the search ... is the protection of the police officer and others nearby...." 463 U.S. at 1049 n. 14, 103 S.Ct. 34694 (internal quotation marks and citation omitted). Therefore, this Court rejects the Government's implicit assertion that Payne's belief that the Defendant had committed a crime or possessed contraband justified the search. *See* Doc. # 36 at 9.

**9.** In its post-hearing memorandum, the Government argues that the failure of the Defendant to stop, after Payne had activated his emergency lights, provided further justification for the search of Defendant's automobile. *See* Doc. # 36 at 9. Although the efforts of a suspect to flee from an officer who is attempting to stop him can give rise to reasonable suspicion that the suspect was engaged in criminal activity (*see Illinois v. Wardlow,* —— U.S. ——, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (individual's unprovoked flight upon

seeing police officers patrolling an area known for heavy narcotics trafficking gave officers reasonable suspicion that the individual was involved in criminal activity)), the evidence does not convince this Court that the Defendant was attempting to flee or otherwise disregarding Payne's command. Payne testified that he sounded his air horn a few seconds after having activated his lights, "which got his [Defendant's] attention." Doc. # 31 at 9. That testimony convinces this Court that the Defendant was not deliberately disregarding Payne or attempting to flee. As that officer indicated, the Defendant had merely been inattentive.

**10.** Payne's testimony, concerning the Defendant's movements after the air horn had been sounded, was not the only aspect of his testimony which lacked credibility. He also testified that one would put gasoline into the red Camaro by flipping the rear license plate down (and testified that the Defendant had implicitly agreed by responding that he had probably forgotten to put the license plate back up, when responding to Payne's question whether he had put gasoline in the car that day), thus attempting to add support to his statement that he could not see the rear license plate on that vehicle. However, the Defendant presented evidence, in the form of a picture of the car and testimony from his son, that the gasoline cap was located on the side of that vehicle.

Accordingly, this Court finds that Payne's testimony concerning his fear that a weapon was located inside the red Camaro was not supported by "specific and articulable" facts. In addition, even if this Court were to credit Payne's second version of the Defendant's movements (i.e., that he observed the Defendant move his shoulder quickly), it would conclude that those actions are not sufficient to form a reasonable belief that the driver is dangerous and may gain immediate control of a weapon. In support of its position that Payne's observations supported the existence of such a belief, the Government has relied upon *United States v. Spencer*, 1 F.3d 742 (9th Cir. 1992). Therein, at approximately 1:00 a.m., police officers stopped a vehicle which was being operated without functioning headlights. The driver was not able to produce her license and informed one officer that the car belonged to an acquaintance named Jim Miller. At that time, the other officer observed the defendant, who was a passenger in the vehicle, bend forward in his seat. When he was asked for identification, the defendant could produce only a Maricopa County jail identification card. A computer check revealed that the license plate was not registered to that vehicle and that the defendant had been convicted for assault with a deadly weapon. A third officer then arrived on the scene and told the others that, the previous night, he had seen the vehicle being driven by someone else and that different license plates had been on it. Based upon all of that information, the officers asked the driver and the defendant to step out of the car. Noticing that the defendant was wearing a heavy leather coat, an officer patted him down and discovered that he was wearing an empty shoulder holster. An officer then searched the interior of the car and discovered a .44 caliber revolver. Not sur-

prisingly, the Ninth Circuit concluded that the District Court had quite properly overruled the defendant's motion to suppress the weapon. 1 F.3d at 745–46. The Government attempts to find support in *Spencer* for its position in this litigation, because one of the facts that justified the officers' actions in that case was the defendant's act of bending over. However, the officers in that case had a wealth of other information, in addition to having observed that act. The Ninth Circuit did not intimate that merely seeing the defendant bend over would have justified the search of the automobile. Therefore, this Court concludes that *Spencer* does not lend support to the Government's position.

The Government has also cited *United States v. Hardnett*, 804 F.2d 353 (6th Cir. 1986), *cert. denied*, 479 U.S. 1097, 107 S.Ct. 1318, 94 L.Ed.2d 171 (1987). Therein, an informant told police officers that four armed men were parked in front of her house in a red, late-model Pontiac. The informant also said that the four individuals had come to her house earlier and threatened her and, further, that some shots had been fired the previous night. When asked how she knew that the occupants of the red Pontiac were armed, she said that she had seen a man in the back seat with a rifle. Upon arriving at that house, the officers stopped the vehicle that had been described to them. The officers then approached the red Pontiac with their guns drawn and ordered the occupants out. A search of the vehicle disclosed weapons, which served as the basis for the defendant's conviction. Upon appeal, the defendant argued that the District Court had erred by not suppressing the weapons that had been discovered in that automobile.[11] The Sixth Circuit affirmed, concluding, *inter alia*, that the search of the vehicle was permissible under *Long*, be-

---

11. The defendant's major argument was that the officers had violated the Fourth Amendment, because they had arrested him without probable cause, rather than permissibly seiz-
ing him under *Terry/Long*. The issue of when such a stop becomes an arrest is not implicated herein.

cause it was supported by specific and articulable facts that reasonably caused the officers to believe that the occupants of the red Pontiac were dangerous and might obtain control of weapons. *Id.* at 358. The facts of this case are not remotely similar to those which justified the search in *Hardnett.* Herein, there is no evidence that Payne had been told by an informant that the Defendant had a weapon in his car, that he had threatened anyone or that he had otherwise been involved in criminal activity.

Moreover, Payne's behavior, prior to searching the red Camaro, belies the existence of such a reasonable belief by that officer that a weapon was located inside the red Camaro. Payne testified that after having observed the Defendant's "furtive movements," he feared that the Defendant had placed a weapon in either his lap or the console. Nevertheless, rather than requesting and waiting for backup or asking the Defendant to step out of his car with his arms raised,[12] he approached the vehicle and spoke to the Defendant, who remained inside. Payne then went about his investigation, walking to the rear of Defendant's car to examine the license plate and, then, returning to discuss the matter with the Defendant. Those are simply not the actions of an officer who has a reasonable belief that the operator of a motor vehicle he has stopped possesses a weapon.

Based upon the foregoing, the Court concludes that Payne did not possess a reasonable belief, based upon "specific and articulable facts," that the Defendant had a weapon. Accordingly, the search of the Defendant's vehicle cannot be justified under *Long.* Therefore, in the absence of probable cause, a search warrant or consent (none of which existed), that search violated the Fourth Amendment. Accordingly, the Court sustains the Defendant's Motion to Suppress Evidence (Doc. # 13),

to the extent that, with that motion, the Defendant requests that the Court suppress the physical evidence seized from his red Camaro on October 31, 1997. Evidence of the controlled substances and currency seized from that automobile on that date will not be admitted at the Defendant's trial.

Government's counsel is directed to advise this Court, within five (5) calendar days from date, whether it wishes to proceed with the prosecution of this lawsuit in light of this Court's opinion rendered herein.

---

**12.** Keller decided on his own to come to the location of the traffic stop, after having heard that Payne had stopped an automobile.

There was no evidence that Payne requested assistance, until he saw Keller arrive at that location.