COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Fitzpatrick, Judges Annunziata and Agee


KEITH LAMONT SANDERS

MEMORANDUM OPINION[*] BY
v.   Record No. 2149-00-1      JUDGE G. STEVEN AGEE
                                    JUNE 19, 2001
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF YORK COUNTY
Prentis Smiley, Jr., Judge

(Mark T. Del Duca; Stallings & Richardson,
P.C., on brief, for appellant). Appellant
submitting.

(Mark L. Earley, Attorney General; Marla
Graff Decker, Assistant Attorney General, on
brief, for appellee). Appellee submitting on
brief.


On June 27, 2000, Keith Lamont Sanders (Sanders) was

convicted in the York County Circuit Court, sitting without a

jury, on charges of possession of cocaine with intent to

distribute, possession of a firearm by a felon, and possession

of a firearm while possessing cocaine. Sanders was sentenced to

serve a term of ten years imprisonment. Sanders appeals his

conviction, averring that the trial court erred in denying his

motion to suppress the Commonwealth's evidence alleged to have

been gathered in an illegal search and seizure in violation

---

* Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

of the Fourth Amendment to the U. S. Constitution.  For the following reasons, we affirm the actions of the trial court and Sanders' convictions.

BACKGROUND

In the early hours of October 7, 1998, York County police officers responded to a robbery that occurred after midnight at the Food Lion grocery store on Route 134.  Virginia State Trooper Lowrance and a trainee, Trooper Maki, received a radio message to "be on the lookout" for the robbery suspect.  The dispatch included a description of the suspect and details of the robbery.  Since the troopers were in the area of the crime, they proceeded to the Food Lion.

Trooper Lowrance viewed a vehicle pull out in front of the police car and drive around to the rear of the shopping center. The vehicle stopped behind the shopping center, and the troopers approached it.  The driver was a father in search of his son, who was out late.

The troopers then went to the front of the shopping center to make contact with the York County officers on the scene. There Trooper Lowrance saw a young man on a bicycle who matched the description of the son of the driver to whom the trooper had just spoken.  The troopers spoke with the young man and learned that someone might be in the "wood line in the southern end of the shopping center" who matched the description of the robbery suspect.  Although the store employees could not describe the

-

robber's face or hair due to his wearing a ski mask, the young man had seen the man without a mask. He described the same general clothing and gave the same general description as the store employees.

Trooper Lowrance decided that the police should search the wooded area for "a black male with a close-cut haircut" wearing dark clothing ("dark pants as in black or dark colored jeans or sweats"). Trooper Lowrance could not recall receiving the height of the lone suspect. The police also knew that the individual "displayed a silver chrome-plated type weapon" during the robbery.

Trooper Lowrance, accompanied by York County Deputy O'Bryan, entered the woods on the south side, towards the rear of the shopping center. As Trooper Lowrance approached a clearing he saw a vehicle stop nearby. Oncoming headlights illuminated a black male whom the trooper believed came from the "wood line."

Trooper Lowrance watched as the black male approached the stopped vehicle and got into the passenger seat. The trooper could not see into the vehicle, so he ran through the woods in order to get a better view of the car which, because of a vehicle behind it, was proceeding into the adjacent subdivision. Based upon the observed activities of the black male, who matched the general description of the robber and was in close

-

proximity to the robbery, Trooper Lowrance decided to stop the vehicle.

As Deputy O'Bryan radioed for assistance to stop the vehicle, Trooper Lowrance walked out of the woods and flagged down the vehicle. It was 2:00 a.m. The trooper asked the female driver for identification but she did not have any identification with her. Trooper Lowrance then asked the passenger, Sanders, for his identification. Sanders, the earlier-observed black male, who matched the robber's general description, provided the trooper with a Virginia identification card and told him that his driver's license was suspended.

As Deputy O'Bryan and Trooper Maki came out of the woods and over to the car, Trooper Lowrance began asking Sanders questions. Sanders appeared "extremely nervous" and seemed to "want to leave as quick as possible." According to Deputy O'Bryan, Sanders was "twitching in the seat, moving around, but he would never look at [the officers] directly."

Trooper Lowrance asked Sanders what he was doing in the area. Sanders told the trooper that he had not been in the area for very long. During the conversation, Sanders constantly moved his hands and would not keep them in sight. Concerned for safety and aware that the at-large robber was armed, Trooper Lowrance asked Sanders to keep his hands where the officers could see them. Sanders continued to be "eager to leave,"

-

continually asking "if there was anything else" the officers needed from him.

At Trooper Lowrance's request, York County Investigator Extine, the initial officer to arrive at Food Lion and who had a more detailed description of the suspect, arrived at the scene of the stop. According to the investigator's notes, the suspect was "a black male . . . around five foot nine, weighing approximately 125 pounds . . . wearing all black clothes and [a] blue stocking mask, [as well as] one latex glove and another glove [which possibly had] the fingers cut out." The robber was armed with a "chrome or silver colored semi-automatic handgun." Deputy O'Bryan and Investigator Extine believed Sanders matched the general description.

Investigator Extine asked the occupants to get out of the vehicle and frisked them for the officers' safety. No weapons were found in the pat-down search.

Once Sanders exited the vehicle, it was apparent that he neither matched the weight nor the height given by the robbery witnesses/victims. Despite the discrepancy, however, Investigator Extine did not discount Sanders' possible involvement in the robbery since the witnesses/victims had been ordered at gunpoint to get down on the floor and gave their description from that perspective. The investigator continued to pursue the possibility that Sanders was the robbery suspect.

-

Investigator Extine and Trooper Lowrance conducted a cursory search of the vehicle as the occupants exited, by shining their flashlights into the interior and glancing over the compartment. Trooper Lowrance scanned the driver's side of the vehicle while Investigator Extine did the same on the passenger side of the vehicle. The two officers then met at the rear of the vehicle to review their observations. Upon learning that Investigator Extine did not look under the front passenger seat or in the glove compartment, the area in which Sanders had been seated, Trooper Lowrance suggested the investigator perform a more thorough check of those specific areas.

In the glove compartment a small caliber silver-plated gun, which was "very similar, if not identical" to the description of the robber's weapon, was found. In addition, a large bag containing several baggies, which were filled with a "rock-like substance consistent with crack cocaine," was discovered. The search of the specific area took "a matter of [a] second, ten, fifteen seconds."

## ANALYSIS

In his motion to suppress the handgun and drugs, and in this appeal, Sanders challenges his detention once it was determined that he did not fit the specific description of the robbery suspect. Sanders does not challenge the initial stop of the vehicle by Trooper Lowrance. "At a hearing on a defendant's motion to suppress, the Commonwealth has the burden of proving

-

that a warrantless search or seizure did not violate the defendant's Fourth Amendment rights." Reel v. Commonwealth, 31 Va. App. 262, 265, 522 S.E.2d 881, 882 (2000). "It[, however] is well established that, on appeal, appellant carries the burden to show, considering the evidence in the light most favorable to the Commonwealth, that the denial of a motion to suppress constitutes reversible error." Motley v. Commonwealth, 17 Va. App. 439, 440-41, 437 S.E.2d 232, 233 (1993). "Ultimate questions of reasonable suspicion and probable cause . . . involve questions of both law and fact and are reviewed de novo on appeal. This Court is bound by the trial court's findings of historical fact unless plainly wrong or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." Neal v. Commonwealth, 27 Va. App. 233, 237, 498 S.E.2d 422, 424 (1998) (citations omitted).

Upon the lawful stop of an automobile, this Court has recognized that the balancing of the interests of the individual(s) and society may permit the police officers, who possess a reasonable articulable suspicion, to require a vehicle's occupants to exit the vehicle. See id. (citing Hatcher v. Commonwealth, 14 Va. App. 487, 491-92, 419 S.E.2d 256, 258-59 (1992)). If the police officers still possess a reasonable articulable suspicion, upon the occupants' exit, that the suspect is dangerous and may have immediate access to a

-

weapon, the officers may frisk the occupants, Terry v. Ohio, 392
U.S. 1, 21 (1968), and search those portions of the vehicle's
passenger compartment in which a weapon might be hidden.
Michigan v. Long, 463 U.S. 1032, 1049 (1983) (citing Terry, 392
U.S. at 21).

## A.  The Detention

Sanders concedes that the officers investigating the
robbery and who witnessed his run from the nearby wood line
adjoining the Food Lion shopping center had a reasonable
articulable suspicion justifying the stop of the vehicle he
occupied and frisking him.  However, it is Sanders' contention
that once he exited the vehicle and the police officers realized
that his physical measurements did not closely match those of
their suspect, his continued detention and the search of the car
were unlawful.  We disagree.

Despite the fact that once he was out of the vehicle and it
was apparent that he did not appear to be either the weight or
height of the robber as described by victim-witnesses, Sanders
still fit the general description.  Investigator Extine remained
concerned that Sanders was the robber and continued the
investigation, as some of the victims had been ordered to the
floor at gunpoint.  He believed those circumstances of the
robbery, where dimensions may have been obscured, warranted
further investigation despite the discrepancies between the
general description and Sanders' appearance.

-

Moreover, based upon their training and experience, the officers still believed that Sanders, who matched the general description, had run at 2:00 a.m. from the wood line in the vicinity of the robbery, and was fidgety and evasive in their presence, was involved in the robbery.  See generally, Richards v. Commonwealth, 8 Va. App. 612, 616, 383 S.E.2d 268, 270-271 (1989).  These facts clearly support the continued brief detention necessary to confirm or dispel the officers' suspicion that Sanders was the robber or otherwise involved.

## B.  The Search of the Vehicle

When police officers detain a vehicle's occupants and reasonably believe the occupants to be dangerous with the ability to gain control of a weapon in the vehicle, the officers may search the portions of the vehicle's passenger compartment where a weapon may be hidden.  See Long, 463 U.S. at 1049 (citing Terry, 392 U.S. at 21).  In the case at bar, the officers at 2:00 a.m. were investigating Sanders' connection to an armed robbery nearby (that occurred just a short time before) in which a gun had yet to be recovered.  The officers reasonably believed that the evasive and fidgety Sanders matched the description of the robbery suspect.  It was, therefore, reasonable for the officers to believe a gun might be in the vehicle, easily accessible to Sanders, and that their safety was in question.  Under these circumstances, the officers were lawfully permitted to search the vehicle, as it was reasonable

-

for them to believe that Sanders posed a danger if he were permitted to re-enter the vehicle.  See id. at 1050.

The contention that the search of the glove compartment was intrusive, burdensome and unlawful is without merit.  First, the return to the front passenger area was a matter of seconds after the cursory search was performed.  It was thus brief and no more burdensome than the cursory search.  Secondly, Long permits officers, with a reasonable suspicion, to search the passenger compartment in which a weapon may be placed or hidden.  Id. at 1049-50; see also Glover v. Commonwealth, 3 Va. App. 152, 156-57, 348 S.E.2d 434, 437-38 (1986).  The underside of the front passenger seat and the glove compartment are areas where a gun could be hidden, and clearly are  permissible areas to be searched under Long.  Therefore, the search was not impermissibly intrusive.

Lastly, but most importantly, the officers' fears and reasonable suspicion did not disappear upon the initial cursory search.  Shining flashlights and glancing over what was in plain view did not dispel the officers' suspicions.  The suspicions remained when they realized that the immediate area to which Sanders had access was not searched.

We can find no case law, and Sanders does not cite any, standing for the proposition that officers, who have a reasonable suspicion that a suspect is involved in criminal activity, cannot make an immediate 15-second check, one

-

performed right after an initial search and separated from the initial search by only a brief "did you check" conversation, of an overlooked area where a suspect has had, and could again have, access to a weapon.  Considering the reasonable suspicion permitting the cursory search was proper (which Sanders concedes), the minimal elapsed time between the cursory search and the search of the glove compartment, and the few additional seconds it took to look in the glove compartment and find the gun and cocaine are of no substantive legal consequence.  We hold that the search of the vehicle was lawful.

The decision of the trial court to deny the motion to suppress is affirmed, and Sanders' convictions are upheld.

<u>Affirmed.</u>

-