**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-5027**

UNITED STATES OF AMERICA,

                    Plaintiff - Appellee,

          v.

AKIBA MATTHEWS,

                    Defendant – Appellant.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.    Catherine  C.  Blake,  District  Judge.
(1:07-cr-00581-CCB-1)

Submitted:  March 10, 2010          Decided:  April 13, 2010

Before KING, GREGORY, and SHEDD, Circuit Judges.

Affirmed by unpublished per curiam opinion.

Marc Gregory Hall, HALL & CHO, P.C., Rockville, Maryland, for
Appellant.  Rod J. Rosenstein, United States Attorney, Cheryl L.
Crumpton, Assistant United States Attorney, Baltimore, Maryland,
for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Akiba Matthews appeals his conviction and sentence for knowingly and intentionally distributing and possessing with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(C) (2006) (Count One), knowingly and unlawfully possessing a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (2006) (Count Two), and knowingly and unlawfully possessing a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1) (2006) (Count Three). Finding no reversible error, we affirm.

I.

A.

Shortly before 8 p.m. on November 15, 2007, Detective Shawn Frey, a narcotics officer with the Baltimore City Police Department, received an anonymous call that a black male was selling drugs from a white van at the intersection of Frederick and Collins Avenues. Detective Frey, accompanied by two plainclothes narcotics detectives, Tavon McCoy and Yoo Kim, proceeded to the area in an unmarked police car to begin surveillance. All three detectives were experienced, having each conducted at least 1000 street-level narcotics arrests in Baltimore.

2

Several minutes after arriving in the general area, the detectives observed a white van pull to the side of the road and turn off its lights. The detectives observed a man exit the vehicle and approach a black female standing next to the van. At this point, the man was holding a dark colored bag, which the detectives suspected contained drugs based upon how the man held it and its apparent "weight." Detective Frey then witnessed the unidentified female hand paper currency to the man, who reached into the bag, removed an item, and passed it to her.

At that point, Detective Kim drove toward the white conversion van and moved to "box the van in" as the black male opened the driver's side door of the vehicle. As the detectives approached the van, Detective Frey stated that he recognized the black male as Akiba Matthews. The three detectives exited their vehicle, identified themselves, and ordered Matthews to show his hands. Instead, Matthews began reaching into the area between the driver and passenger seats and kept the van in gear. Weapons drawn, the detectives repeated their request for Matthews to show his hands. Detective Frey, who had moved to the driver's side of the van, radioed for backup and waved his flashlight to examine the van's interior. In so doing, Detective Frey saw a handgun protruding from the area between the seats where Matthews was reaching. Matthews also began asking Detective Frey, by name, why he was being stopped.

Shortly thereafter, Sergeant Darryl Collins arrived and proceeded to the driver's side of the vehicle. As this backup arrived, Matthews placed his hands on the steering wheel. Sergeant Collins then assisted Detective Frey in removing Matthews from the vehicle without incident. As Matthews was exiting the vehicle, Detective McCoy observed several clear bags with what appeared to be drugs in the door panel. Detective Kim also secured the handgun, a loaded Ruger .40 caliber, that Detective Frey had seen between the seats. The clear bags that Detective McCoy saw contained 60 gel caps of heroin and some marijuana. The detectives also recovered a small amount of marijuana and $274 in cash from Matthews's right pants pocket.

## B.

Prior to November 15, 2007, Detective Frey had two interactions with Akiba Matthews. First, in 2001, Detective Frey asked Matthews to vacate a street corner in a high crime area. After Matthews refused, Frey attempted to arrest him for loitering, but Matthews resisted and a wrestling match ensued. Next, in 2002, Detective Frey witnessed Matthews complete a hand-to-hand drug sale and attempted to arrest him. Matthews fled the scene on foot, and Detective Frey eventually caught him on a nearby front porch. Another fight occurred, this one ending with both Matthews and Detective Frey suffering bruises and cuts.

4

Matthews was also well known to the Baltimore City Police Department because of his role as the camera-man in the infamous "Stop Snitching" video[1] that appeared in 2004. As defense counsel described it, that video featured "inner-city gangster types doing a lot of talking and bragging and threatening." The video also gained traction in the national media because of an appearance by NBA star Carmelo Anthony.

In response, the Baltimore Police Department created its own video, "Keep Talking." This video included footage of Matthews with his name in bold letters and described him as the "so-called cameraman" for "Stop Snitching."

## C.

Prior to trial, Matthews moved to dismiss the indictment, contending that the Government had destroyed exculpatory evidence — a videotape recording of his stop. The Baltimore City Police Department operates, at locations throughout the city, a system of surveillance cameras, commonly called PODSS TV cameras,[2] or "blue light camera[s]." PODSS cameras are unmanned cameras situated atop poles that record video footage to a removable hard drive located in a box under the cameras. The cameras rotate constantly on a 360 axis. The video footage stays on the hard drive for five days and is then

---

[1] The actual film title is "Stop F***ing Snitching."
[2] PODSS stands for Police Overt Digital Surveillance System.

5

recorded over. If someone requests the footage before the end of a five-day period, a technician in a bucket truck must be sent to physically remove the hard drive from the camera.

The intersection where the detectives stopped Matthews, Frederick and Collins Avenues, has a PODSS camera. Matthews's counsel in a state prosecution subpoenaed the PODSS footage on December 7 and December 14, 2007. Because, however, these requests were more than five days after the events in question, the recordings had been taped over and could not be recovered. At a hearing on Matthews's motion to dismiss the indictment, Sergeant Derrick Lee, with the Department's Legal Affairs Office, testified that upon receiving the subpoena he informed counsel that the footage could no longer be retrieved. Sergeant Lee further testified he had never personally viewed any footage that the Frederick/Collins camera recorded on November 17, and he did not know if the camera captured Matthews's stop. Likewise, Detective Jesse Schmidt, a member of the Criminal Intelligence Unit that operates the PODSS system, testified that no one had requested the footage from that camera to see if Matthews's stop was captured. Detectives Frey and McCoy testified that they were aware of the PODSS camera but that they never requested the recordings for their drug arrests because they found them unhelpful and not a part of their standard investigative practice. Detective Kim testified that

6

he had once requested footage from a PODSS camera in a murder investigation but found the footage unhelpful because, on that occasion, "the POD camera was going 360. It saw the incident start, but it missed the homicide. When it came back, the suspect was gone."

The district court ultimately denied Matthews's motion to dismiss, and the case proceeded to trial. Following a four-day jury trial, Matthews was convicted of all counts. The district court, however, granted Matthews's unopposed motion for a new trial because an unredacted police memo was erroneously submitted to the jury. After a second jury trial, Matthews was again convicted of all counts. The district court ultimately sentenced Matthews to 360 months' imprisonment.


II.

On appeal, Matthews raises three arguments: that the district court erred in denying his motion to dismiss the indictment; that the district court erred in refusing to suppress the evidence seized during the stop; and that the district court abused its discretion in sentencing Matthews. We review each in turn.

A.

Matthews first argues that the district court erred in denying his motion to dismiss the indictment based on the

7

Government's failure to preserve the PODSS video footage. We review the district court's ruling on a motion to dismiss an indictment de novo. United States v. Brandon, 298 F.3d 307, 310 (4th Cir. 2002). Any factual findings made by the district court are reviewed for clear error. United States v. Woolfolk, 399 F.3d 590, 594 (4th Cir. 2005).

Under the Due Process Clause of the Fourteenth Amendment, the Supreme Court developed "'what might loosely be called the area of constitutionally guaranteed access to evidence.'" California v. Trombetta, 467 U.S. 479, 485 (1984) (quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982)). The Court has specified that, to the extent the Constitution imposes a duty upon the government to preserve evidence, "that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense"– i.e., evidence that is constitutionally material. Id. at 488-89. To satisfy this standard, evidence must: (1) "possess an exculpatory value that was apparent [to the police] before the evidence was destroyed," and (2) "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. at 489. The mere possibility that lost or destroyed evidence could have exculpated a defendant is not sufficient to satisfy Trombetta's requirement that the exculpatory value be "apparent" to the police before

8

destruction.  Arizona v. Youngblood, 488 U.S. 51, 56 n.* (1988).  Additionally, "if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence."  United States v. Bohl, 25 F.3d 904, 910 (10th Cir. 1994) (citing Youngblood, 488 U.S. at 58).  "[M]ere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith."  Id. at 912.

Applying this standard, we believe the district court correctly denied the motion to dismiss the indictment.  The district court first held that the PODSS video footage did not rise to the level of Trombetta, that is, that the footage did not possess exculpatory value on its face.  The district court found that it "takes fairly substantial efforts on the part of the police to extract the hard drive," that PODSS footage is used "primarily in the situation where there is not a police officer witness," and that "approximately 90% of the time it doesn't capture anything worthwhile."  The district court further found that Detectives Frey, McCoy, and Kim never pulled PODSS footage for routine street-level drug arrests, such that "there is nothing out of the ordinary about the decision that Detective Frey made in this particular case."  Building upon these findings, the district court made the additional finding

9

that "[t]here is simply nothing in the evidence in front of me at all, no testimony to show that this would be exculpatory." As the district court explained, "[t]o suggest that the PODSS camera would show some different version of events, such as that the drug transaction never took place, on the record in front of me is speculation. There is simply nothing to support it." Continuing, the district court concluded that, even under the Youngblood standard, that is, assuming the evidence was "potentially useful," there was "not evidence of bad faith on the record."

We agree with the district court that this evidence did not satisfy the requirements of Trombetta because the evidence's exculpatory value was not apparent on its face. Three experienced narcotics detectives testified as to the events leading to Matthews's arrest. For this evidence to have apparent exculpatory value, all three detectives had to have fabricated their testimony. In a similar situation, the Tenth Circuit found that neither prong of Trombetta was satisfied when a state trooper accidently erased footage of a traffic stop he conducted. United States v. Parker, 72 F.3d 1444 (10th Cir. 1995). The stop eventually led to a search of the car that uncovered narcotics. In upholding the district court's conclusion that the erasing of the video did not violate Trombetta, the Tenth Circuit explained, "the only way the erased

10

video tape evidence could be 'apparently' exculpatory is if it demonstrated that the events did not occur as [the trooper] related, that is, that he was lying about the events." Id. at 1452. And, "[w]hether [the trooper] was telling the truth was essentially a question of credibility for the district court." Id. Likewise, in this case, the district court found the three detectives were credible and made the factual finding that there was "nothing" to suggest the video would show anything other than Matthews conducting a drug deal with an unknown black female.

As to the second prong, whether the evidence is otherwise readily available, the Tenth Circuit in Parker also answered this question in the negative, explaining "along with [two additional state troopers], [the] Defendants participated in the recorded events." Id. Thus, "Defendants had a readily available source to replace the missing video tape — [the trooper's testimony] and their own testimony of the events." Id. Again, in this case the evidence Matthews sought — a narration of the events of that evening — was available in cross-examination of the detectives and in Matthews's own testimony at the hearing.

In the alternative, Matthews contends that the evidence on the PODSS camera was at least "potentially useful" and that Detective Frey's actions in not requesting the tape

11

were in bad faith. Again, the district court made the finding that the record was devoid of evidence of bad faith. In response, Matthews contends that his prosecution is a set-up by the police, and that such actions are obviously in bad faith. Matthews cannot rebut the fact, however, that failing to request the PODSS footage was in line with the detectives' actions in all of their street-level drug arrests. At best, the failure to request the tape for purposes of evidence preservation would appear to be negligence, and "[m]ere negligence is not sufficient to establish . . . bad faith" in this context. Parker, 72 F.3d at 1452.

Accordingly, we find no error in the district court's denial of Matthews's motion to dismiss the indictment.

B.

Matthews next argues that the district court erred in refusing to suppress the handgun and drugs discovered during the search of Matthews and his van or, in the alternative, in failing to grant a judgment of acquittal on those grounds. In reviewing the denial of a motion to suppress, the court reviews the district court's findings of historical fact for clear error, "giving due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690, 699 (1996). The court reviews legal conclusions de novo. Id. And, "[b]ecause the district

12

court denied the motion to suppress, we construe the evidence in the light most favorable to the Government." United States v. Perkins, 363 F.3d 317, 320 (4th Cir. 2004).

Our review of the record, however, leads us to conclude that Matthews did not preserve this claim. Prior to trial, Matthews moved for dismissal of the indictment under Trombetta and also filed a motion to suppress statements he made to Detective Frey after his arrest but before Miranda warnings were administered. Matthews never moved to suppress evidence recovered from the stop, and he may not do so now. See Fed. R. Crim. P. 12(b)(3) (noting that "motions that must be made before trial" include "a motion to suppress evidence"); see also United States v. Ruhe, 191 F.3d 376, 386 (4th Cir. 1999) (announcing the "general rule . . . that a defendant forfeits a suppression claim if that claim is not timely raised").

Moreover, even assuming Matthews preserved this claim, it is without merit. Police officers are permitted to make investigatory stops when they possess "reasonable suspicion," based on articulable, particularized facts, that "criminal activity may be afoot." Terry, 392 U.S. 1, 30 (1968). And, in the automobile context, "where a suspect is an occupant or recent occupant of a vehicle at the initiation of a Terry stop, and where the police reasonably believe the suspect may be dangerous and that there may be readily-accessible weapons in

13

his vehicle, [Michigan v.]Long authorizes a protective search of the vehicle for weapons." In United States v. Holmes, 376 F.3d 270, 280 (4th Cir. 2004).

In this case, the detectives clearly had reasonable suspicion to initiate a traffic stop. Detective Frey received an anonymous tip that a white van in the area of Frederick and Collins Avenues was being used for drug deals; the three detectives began surveillance, observed the white van, and watched the driver conduct what all three experienced narcotics detectives believed was a hand-to-hand drug deal. These events created reasonable suspicion to stop Matthews. And, as the detectives approached the car and commanded Matthews to exit, he ducked down toward the area between the seats, where Detective Frey was able to see a handgun. That observation satisfies the requirements of Holmes for a protective search of the car. As Matthews was being removed from the car, Detective McCoy observed what he believed were drugs in the side of the driver's side door, further providing authorization for the search.

C.

Finally, Matthews challenges his sentence of 360 months' imprisonment. A sentence is reviewed for reasonableness under an abuse of discretion standard. Gall v. United States, 552 U.S. 38, 51 (2007). This review requires consideration of both the procedural and substantive reasonableness of a

14

sentence. Id. After determining whether the district court properly calculated the defendant's advisory guideline range, we consider whether the district court considered the § 3553(a) factors, analyzed the arguments presented by the parties, and sufficiently explained the selected sentence. Id.; see United States v. Carter, 564 F.3d 325, 330 (4th Cir. 2009) (holding that, while the "individualized assessment need not be elaborate or lengthy, . . . it must provide a rationale tailored to the particular case . . . and [be] adequate to permit meaningful appellate review"). Finally, we review the substantive reasonableness of the sentence, "taking into account the totality of the circumstances[.]" United States v. Pauley, 511 F.3d 468, 473 (4th Cir. 2007).

In this case, a probation officer prepared a Pre-Sentence Report (PSR) after the jury convicted Matthews. The PSR first determined that Matthews was a career offender under USSG § 4B1.1 and adjusted his criminal history category to VI.[3] With the career offender designation, his offense level was adjusted to 33, yielding an advisory guidelines range of 360 months to life, when taking into consideration the mandatory consecutive 60 month sentence imposed on the § 924(c) charge.

---

[3] Indeed, Matthews's criminal history was so extensive that, even absent the career offender designation, his criminal history category was VI.

15

At sentencing, Matthews moved for a downward departure based upon his age (36 years old at sentencing), the time between his prior convictions, the leniency received for past convictions, and his current conditions of confinement in a state Supermax facility. Matthews also contended that he was singled out for prosecution because of his role in the "Stop Snitching" video. Ultimately, Matthews requested a sentence of 240 months' imprisonment. The Government requested a sentence within the advisory guidelines range, focusing upon Matthews's criminal history and his role in the "Stop Snitching" video.

The district court sentenced Matthews to 360 months' imprisonment, the low end of the advisory guidelines range. The district court rejected Matthews's argument that his criminal history was overstated, explaining "[t]he criminal history that [Matthews] has displayed, the consistency of it, and the sustained period of drug dealing he has been involved in, make it inappropriate to depart downward from the career offender status." The district court next recounted the factors under § 3553(a) and concluded that they did not support a below-Guidelines sentence. In particular, the district court noted that Matthews was "still not accepting responsibility for any of the activities in November of 2007, which I think were quite thoroughly proved twice to a jury." The district court, in weighing whether a downward variance was appropriate, also

16

considered Matthews's presence in the "Stop Snitching" video, remarking that "that video and his involvement was perpetuating one of the most pernicious, dangerous aspects of Baltimore's criminal culture." Thus, "while it is not something that he should be punished for, it is certainly something that is . . . a legitimate factor to consider when being asked to vary and go below what is otherwise the guideline range in this case."

We believe the district court did not abuse its discretion in sentencing Matthews. The sentence is procedurally reasonable: the district court correctly calculated the criminal history category and offense level and correctly identified the advisory guidelines range. The district court stated that it considered the § 3553(a) factors, and it included a lengthy statement of reasons as to why a sentence at the low end of the guidelines was appropriate but a downward variance was not. The district court's decision to consider Matthews's role in the "Stop Snitching" video was not improper; Matthews alluded to the video throughout trial, questioning each detective on their familiarity with the video. And, Matthews's role with the video is certainly relevant to his personal circumstances and history. As the district court aptly explained, while Matthews did not deserve additional punishment for his role as the cameraman, it was certainly "a legitimate

17

factor to consider when being asked to vary and go below what is otherwise the guidelines range."

The sentence is also substantively reasonable. Because the sentence was within the advisory guidelines range, it is presumptively reasonable. United States v. Abu Ali, 528 F.3d 210, 261 (4th Cir. 2008). And, Matthews makes no arguments in his brief as to why the sentence is substantively unreasonable.

## III.

For the foregoing reasons, we affirm the district court's judgment. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

<u>AFFIRMED</u>

18